Bullard, J.
delivered the opinion of the court.
The plaintiff, curator of the estate of Jean Gravier, represents in his petition, that his intestate always conducted his business in a very careless manner, neglected his numerous engagements, and from the year 1803 to the time of his death suffered many judgments to be rendered against him, and much of his property to be seized and sold under execution. That being constantly in dread of executions and pressed for money, he early commenced a practice of concealing his property from his creditors by passing simulated sales of it, and making conveyances of his property to various persons who advanced him money on usurious interest and who were to hold the property in trust for him and to secure their advances. It is alleged that the persons with whom these simulated contracts were principally entered into, were the late [126] Meólas Boche, and Etienne, Pierre and Antoine Oarraby. The petition enumerates several pieces of property which it is alleged were conveyed to the Carrabys by sueh'simulated contracts without consideration, but intended to secure the said Carrabys’ occasional advances of money, and to prevent the seizure of said property. The said Gravier always remaining the real owner of said property. It is further alleged that the affairs of Gravier in that manner became utterly deranged, and that in 1824, judgments were rendered against him for large amounts, and that the property remaining in his name was seized and sold, but that the Carrabys protected the property thus nominally conveyed to them from seizure. That after that period Jean Gravier abandoned his affairs as hopeless and did not venture to let it be known that he was the owner of said property, but on the contrary concealed his other property and denied his title to it, lest it should be immediately seized by his judgment creditors. The plaintiff proceeds, to allege that the property thus conveyed was sold by the Carrabys, and the object of the present suit is to compel their legal representatives to account to the estate of Gravier for the value of the property thus alienated by them to the prejudice of Gravier.
The judgment of the court of probates having sanctioned to a certain extent these pretensions of the plaintiff, the defendant prosecutes the present appeal. His counsel has interposed in this court a peremptory exception founded upon the alleged illegal and immoral character of the agreements between the original parties and invokes the maxims of law, “ allegans turpitudinem suam non est audiendus; ” and “ ex turpi causa non oritur actio.”
The counsel for the. appellee contends in reference to this exception, that it ought not to prevail because the plaintiff being curator of the estate of Gravier represents the creditors rather than the heirs, and that although since *80 [127] the institution, of this suit it has turned out that the estate is solvent, and that the amount reserved may benefit the heirs, yet the principle relied on is inapplicable to the present case.
The first part of this argument assumes as a principle that contracts admitted to be reprobated by law contrary to good morals and public order may be enforced for the benefit of creditors although not for the direct personal advantage of one of the parties. But the Code declares that an obligation without a cause or with a false or an unlawful one can have no effect. The taw gives no action to enforce them whoever may demand it, unless it be in cases of innocent holders of the evidence of such contracts in a commercial form. It is enough in the present case, in our opinion, that the legal representative of Gravier is plaintiff to let in the inquiry as to the turpitude of the transactions out of which this suit has grown.
By the Roman law the right to recover back what had been paid on an illicit contract depended upon the question which of the parties was dishonest or whether both were chargeable with the same turpitude. If the party who had received were alone dishonest, the sum paid could be recovered back even although the purpose for which it was given had been accomplished. “ Quod si turpis causa accepientis fuerit, etiam si ressecuta sit, repeti potest.” As in the case supposed by Julien of money paid to prevent the commission of sacrilege, robbery or murder. But where both parties are chargeable with the same turpitude the law gives no action. “ Ubi autem et dantis et aecepientis turpitudo versatur non posse repeti dicimus.” And the case supposed by Paul is that of a bribe given to the adversary’s attorney, which could not be recovered back. “ Ham turpiter accepta pecunia justius penes eum est qui deceptus sit, quam quidecepit.” In such cases the maxim is “in pari causa turpitudinis potior est causa possidentis.” Pothier’s Pandectes, vol. 5, book 12, title [128] 5. These principles apply in cases where the corrupt or reprobated contract has had its effect and the object of the action is to repair the injury complained of by one of the parties. It is hardly necessary to add that a, fortiori the law will not lend its aid to enforce the performance of such contracts in the first instance. The principle has been held to apply not only in relation to the original corrupt or reprobated contract but to any new engagements growing immediately out of it. The chief justice in delivering the opinion of the court of the United States in the case of Armstrong v. Toler, says, “no principle is better settled, than that no action can be maintained on a contract the consideration of which is either wicked in itself or prohibited bylaw. How far this principle is to effect subsequent or collateral contracts the direct and immediate consideration of which is not immoral or illegal, is a question of considerable intricacy, on which many controversies have arisen and many decisions have been made.” After reviewing several of those cases the chief justice says, “ one of the strongest cases in the books is Steers v. Laushley, 6 Term Rep. 61, where the broker had been concerned in stock jobbing transactions and had paid the losses, drew a bill of exchange for the amount on the defendant and after its acceptance indorsed it to a person who knew of the illegal transaction on which it was drawn, the court held that such indorsee could not recover on the bill.” 11 Wheaton, 258—274.
*81 This court has in more than one case recognized these principles and especially in the case of Mulhollan v. Voorhies, 3 Martin, N. S. 48.
But the counsel for the appellant relies upon the case of Griffin v. Lopez, 5 La. Rep. 145, as sanctioning a different doctrine, and upon 2 Chardon, Traite du Dol et de la Fraude. In that case the original intent of the parties does not appear to have been dishonest or immoral. One of the parties it was alleged entered into a simulated contract with the other in order to protect a part of his property from unjust lawsuits and prosecutions by certain ene- [120] mies. It appears that there was also a counter letter executed: The object of the suit was to prevent the apparent vendee from disposing of the property as his own, after having obtained surreptitiously possession of the counter letter which alone showed the true character or rather the absence of any contract between the parties. A simulation is not necessarily a fraud. It is only when injury to third persons is intended that it becomes fraudulent; and the decision in the case of Griffin v. Lopez does not appear to militate against the principles above expressed; for, if the simulation was at first innocent and not intended to injure third persons, the subsequent suppression of the counter letter and conversion of the property to the sole use of the apparent vendee was in itself a fraud against which the apparent vendor was probably entitled to the protection of the law. We are not prepared to say that the principle recognized in that case is applicable to the present.
But we are referred to a French author who has treated ex professo the subject of fraud and simulation and the plaintiff’s counsel places great reliance upon him in support of his cause. The theory of this author is, that even in relation to the parties themse ves simulation is a ground of radical nullity, and that each one may attack it against the other who seeks to consummate the intended fraud or by a new fraud profit by the first. He lays down an axiom well worthy of attentive consideration as the source in our opinion of the errors of his system — to wit: “ that whatever may he the object or purpose of a fraudulent simulation it has that reprobated character only became it infringes a prohibitory disposition of the law. Now in this case it can have no effect.” He then quotes the two articles of the Code Napoleon, 1131 and 1133, corresponding to those of the Code of Louisiana, which declare that an obligation without cause or consideration or with a false or unlawful one can have no effect; and that the cause is unlawful when it is prohibited by law, when it is contrary to good morals and public order, he proceeds to say, [130] “ we have nowhere either in the Code or elsewhere any statute more absolute or less susceptible of exception; it is one of the fundamental principles of the-theory of contracts, and it is established for the sole interest of the contracting’ pan-ties, since in relation to third persons their condition is secured by art.. 1165 ; contracts have their effects only between the contracting parties and do not affect third persons.”
Again the author says, “ the contrary system is founded upon the axiom, “propriam turpitudinem allegans non est audiendus” — it will be instantly perceived that this axiom can he properly invoked only- by third persons,when the author of the fraud seeks to use it as an arm against them. Another-axiom not less moral may be opposed to it, “ nemini sua fraus patrocinad *82 debet.” But it is not by axioms so general and which are not re-enacted by any text of our Code, that exceptions can be created to a rule so imperative as that set forth in the articles which we have first cited.
This position, that the maxim which denies an action in reference to immoral or prohibited contracts has relation only to third persons, cannot receive the sanction of this court. The whole of the 5th title of the 2d book of the Digest treats the matter as it relates to the parties towards each other, either as the right to enforce dishonest and immoral contracts or to recover back what has been already paid in execution of them. Nor can we concur with that author in the opinion, that this stern morality of the Roman law has not been retained in our modern legislation. On the contrary we think that when the Oode declares that contracts prohibited by law, or contrary to good morals or public order shall have no effect, it recognizes the same general principle, and although the fundamental precepts of the ancients “ honesté vivere, alterum non ldere, swum cwique tribuere” constituting the religion [131] of the law, have not been expressly venerated as formal texts, yet they lie at the foundation of our jurisprudence, and that courts of justice are not reduced to the humiliation of adjusting among dishonest men the results of their unholy speculations or of protecting one party against another while engaged in a common purpose, at war with the best interests of society and subversive of public order.
It remains to inquire whether these principles are applicable to the case now before the court, and what was the true character of the dealing and contracts between the original parties. It is not denied that the pretended sale of lots and other property by Gravier to the Oarrabys was for the double purpose of protecting the property against the pursuits of his creditors and of securing the reimbursement of certain loans of money and other advances with usurious interest; and that to a certain extent it was successful. That such contract was fraudulent and might have been successfully attacked as such by the creditors at the time, if they had had the proofs now before us, we cannot doubt. The Oarrabys were made to appear to the world as absolute owners and thus the judgment creditors of Gravier were frustrated in their pursuits. The ultimate agreement was that the property should he sold by the Oarrabys as theirs, and the price accounted for to Gravier over and above the amount of their advances, in preference to the judgment creditors. Would a court of justice have lent its aid to enforce such a contract? to carry out the fraudulent intentions of the parties ? Oould Gravier at that time have recovered damages from the Oarrabys for the non-performance of such a contract ? We think he could not. “ In pari causa turpitudinis potior est conditio possidentis.” This action is brought by his legal representative to recover from the estates of the Oarrabys the value of the property thus alienated together with damages.
We conclude that the exception ought to be sustained.
[132] It is therefore ordered, adjudged and decreed, that the judgment of the nourt of probates he avoided and reversed and 'that ours be for the defendant with costs in both courts.