**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 96-30929
_____

WILLIAM C. DAVIS,

Plaintiff-Appellee
Cross-Appellant

versus

ERNEST L. PARKER,

Defendant-Appellant
Cross-Appellee

_____

Appeal from the United States District Court
For the Western District of Louisiana
(Nos. 91-CV-2493, 93-CV-759)
_____

May 12, 1998

Before REYNALDO G. GARZA, SMITH, and WIENER, Circuit Judges.

WIENER, Circuit Judge:[*]

Defendant-Appellant-Cross-Appellee, Ernest L. Parker, Esq., appeals a jury verdict in favor of Plaintiff-Appellee-Cross-Appellant, William C. Davis, whose claims had their genesis in a written asset transfer agreement between the two parties. Davis,

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

a long-time Louisiana resident who had moved to Texas, brought suit in federal district court in Louisiana on diversity jurisdiction after Parker refused to return to Davis the assets in question — capital stock in a closely-held Louisiana corporation — that he had transferred to Parker in accordance with that agreement. The case was tried to a jury, which found that — notwithstanding the fact that the asset transfer agreement contained no express stipulation obligating Parker to return Davis's stock — Davis had retained ownership of his stock vis-à-vis Parker, as well as the right to recover it, by virtue of Parker's oral promise to hold the stock other than as owner and return it to Davis on request. The jury awarded Davis monetary damages consisting of (1) $175,000 for emotional distress, anguish, or inconvenience that he experienced as a result of Parker's refusal to return the stock; (2) attorneys' fees as provided in Davis's contingent fee agreement with his attorneys; and (3) $1,026,951.50 for loss of the benefits that he would have received had he held the Campbell Wells stock or for benefits that Parker wrongfully received as a result of his refusal to return Davis's stock. In keeping with the jury's verdict, the district court rendered judgment for Davis, replicating the particulars of the verdict and declaring Davis to be the owner of the stock in question or its value as of the close of business on the last business day before trial commenced. The district court also assessed costs against Parker, purported to include expert

2

witness fees.

Parker appeals the district court's denial of his post-trial motion for judgment as a matter of law (j.m.l.) or, alternatively, a new trial. Parker urged his motion on grounds that, inter alia, (1) the evidence conclusively established that Davis entered into the asset transfer agreement for the illicit purpose of defrauding his creditors, so that, as a matter of law, Davis cannot recover from Parker; (2) the jury's finding that a contract existed between Davis and Parker, whereby Parker agreed to hold and return Campbell Wells stock to Davis, is erroneous as a matter of law, as such an agreement must be in writing to be enforceable; (3) Davis's claims, as tried, were time-barred under Louisiana's prescriptive period for legal malpractice actions; (4) the district court erroneously permitted Davis to call two of Parker's former clients to testify in rebuttal; and (5) the jury's awards of (a) nonpecuniary damages, (b) attorneys' fees, and (c) "excess distributions" were without legal foundation or sufficient evidentiary basis. Parker also contends that the trial court erred in its assessment of costs against him and in its valuation of Davis's Campbell Wells stock. Davis cross-appeals the court's denial of his motion to alter or amend the judgment.

Finding no reversible error in the denial of Parker's motions or in the court's assessment of Davis's costs and the valuation of his stock, we affirm except to the limited extent that we (1) reverse the award of emotional damages, (2) modify the award of

3

attorneys' fees to reflect the effect of our reversal of the emotional damages award, and (3) vacate the award of costs to the extent, if any, that expert witness fees were included and remand this issue for further consideration by the district court. As for Davis's cross-appeal, we make a minor adjustment in the judgment of the district court but otherwise affirm, thereby denying the cross-appeal. In sum, the judgment of the district court is reversed in part, vacated in part, modified in part, and —— as modified —— affirmed and remanded for further proceedings consistent with this opinion and, ultimately, for entry of a revised judgment for Davis reflecting the dispositions we make today.

I

FACTS AND PROCEEDINGS

Davis and Parker were longtime personal friends and business associates when Parker offered Davis an interest in Campbell Wells Corp. ("Campbell Wells") —— a company that operated an oil field waste disposal facility. Parker, who was also Davis's attorney, had previously invested in several business ventures with Davis. Campbell Wells had come to Parker's attention when he was approached by Logan Nichols, also an attorney and a law school classmate of Parker's. Nichols sought Parker's aid in finding a buyer or buyers on behalf of the Campbells, who owned and operated the facility. The Campbells had offered Nichols a substantial finder's fee if he could locate a buyer, which fee Nichols proposed sharing with Parker as consideration for his assistance.

4

Parker in turn enlisted the help of Richard Barnett, a client of his and a petroleum engineer with connections in the oil patch. Barnett knew several potential investors but wanted to learn more about the facility and assess its value before making any recommendations. After visiting the disposal facility, Barnett became convinced that Campbell Wells represented an attractive investment opportunity and suggested to Parker and Nichols that the three of them buy the business themselves rather than brokering it. Presumably with the assent of Nichols and Barnett, Parker invited Davis to join the threesome as an equal partner in the purchase of Campbell Wells.

The four men bought all issued and outstanding stock of the corporation in September 1985. They also formed a partnership, CAMPCO—1985, to acquire the immovable property on which the waste disposal facility was located. Their acquisitions were funded by a million dollar loan from Guaranty Bank & Trust Co. of Lafayette ("Guaranty Bank") and by promissory notes totaling $1,052,000, payable to the Campbells. An additional $500,000 was borrowed from the bank to cover start-up costs. As security for its loans, Guaranty Bank took a collateral first mortgage on the immovable property and a pledge of the capital stock in Campbell Wells; the Campbells' promissory notes were secured by a subordinated mortgage. In addition, each of the four purchasers signed personal guaranties to Guaranty Bank and to the Campbells.

Although Campbell Wells continued to prosper, Davis began to

experience financial difficulties with some of his other business ventures and by early 1986 was on the brink of bankruptcy. Parker represented Davis in an attempted work-out with his creditors, and also advised Davis as his friend and business partner. Parker warned Davis that his creditors might seize his interest in Campbell Wells and suggested that Davis transfer his interest to Parker. On February 3, 1986, by a written Act of Cash Sale & Assumption — prepared by Parker — Davis transferred stock representing his twenty-five percent ownership interest in Campbell Wells to Parker. The instrument specified that Parker was assuming Davis's debt and paying Davis $1000. Davis testified that he was neither given a copy of the document by Parker nor advised by him to consult another attorney before signing it.

This is the point at which the antagonists' respective versions of the saga start to diverge. Davis testified that Parker agreed to hold the Campbell Wells stock "in trust" until Davis resolved his financial problems, orally committing to return the stock to Davis on request. According to Davis, Parker proposed the arrangement as a means of ensuring the satisfaction of their substantial mutual debt: With Davis's interest in Parker's hands, they could avoid outside interference in the Campbell Wells venture by preventing a "race to the courthouse" by Davis's creditors. More importantly, in avoiding seizure by one anxious creditor, cash flow from the investment could be used to pay off more debt. In

6

stark contrast, Parker testified that he acquired full ownership of Davis's stock as consideration for assuming the debt that Davis had incurred in his acquisition of Campbell Wells stock.

Davis was eventually successful in working out of his financial straits and avoiding bankruptcy. Meanwhile, Campbell Wells continued to thrive, and in June 1990, the remaining shareholders of record — Parker and Nichols — agreed to merge Campbell Wells with Sanifill, Inc. ("Sanifill").[1] Pursuant to the merger agreement, Parker surrendered all outstanding stock in Campbell Wells in exchange for Sanifill stock.[2]

Davis testified that he had become concerned about Parker's control over the transferred shares as early as 1988, well before the Sanifill merger. Davis mentioned the arrangement to an attorney representing him on unrelated matters, who advised Davis to discuss his Campbell Wells interest with Parker. Some time later, Davis broached the subject with Parker during a meeting in Lafayette, asking for Parker's reassurance that their arrangement would be honored. According to Davis's testimony, Parker was initially very angry at him for having discussed the matter with another attorney, but Parker assured Davis the following day that his stock would eventually be returned.

---

[1] Coincidentally, the fourth partner, Barnett, had transferred his interest in Campbell Wells to Parker, also in February 1986.

[2] See infra note 106.

Davis testified that he had several subsequent discussions with Parker concerning the state of Campbell Wells' affairs, each discussion characterized by Davis as having included Parker's reassurance that the business was going well and that Davis could count on recovering his interest. In September 1990, following the Sanifill merger, Parker contacted Davis at his home in Austin and scheduled a visit. Davis assumed that Parker had arranged the meeting to conclude their business under the asset transfer agreement, but Parker frustrated Davis's expectations by avoiding any discussion of Campbell Wells. When Davis eventually broached the subject, Parker announced that he intended to keep Davis's proportionate share of the Sanifill stock acquired in the merger, and a heated argument ensued.

This lawsuit was filed in November 1991. In it, Davis asserted claims for breach of contract, rescission, detrimental reliance, and nullity, and sought to enforce the written-and-oral agreement or to rescind it with an accounting. Alternatively, Davis sought to annul the written agreement under which his interest in Campbell Wells had been transferred. Parker moved for summary judgment on the ground that Davis's claims were time-barred under Louisiana's prescriptive period for legal malpractice actions. The district court granted Parker's motion and dismissed Davis's suit with prejudice. On appeal from that dismissal, we reversed and remanded (Parker I), holding that the prescriptive period for legal malpractice actions was not applicable to Davis's

8

claims.[3]

On remand, the case was tried to a jury. A number of mid-trial motions by Parker were denied and, following the close of the evidence, each party made a motion for j.m.l., both of which the court denied. The jury returned a verdict in favor of Davis on all causes of action submitted,[4] and judgment was entered by the district court on May 31, 1996, in accordance with the verdict. Parker filed post-trial motions under Federal Rules of Civil Procedure (F.R.C.P.) 50 and 59, which the trial court denied. Davis filed a F.R.C.P. Rule 59 motion seeking to amend some aspects of the judgment, but the court denied this motion as well. Parker timely appealed, and Davis timely cross-appealed.

II

ANALYSIS

A. STANDARD OF REVIEW

We review the denial of a motion for j.m.l. de novo, viewing all evidence in the light most favorable to the non-moving party.[5] We will conclude that the motion should have been granted only when "the evidence at trial points so strongly and overwhelmingly in the

---

[3]Davis v. Parker, 58 F.3d 183, 189-90 (5th Cir. 1995).

[4]Davis apparently amended his pleadings on remand, adding a claim for fraud. The jury did not reach Davis's detrimental reliance claim as it found that a valid oral retransfer agreement existed and was breached.

[5]Burroughs v. FPP Operating Partners, L.P., 28 F.3d 543, 546 (5th Cir. 1994).

9

movant's favor that reasonable jurors could not reach a contrary conclusion."[6]  The "decision to grant [a j.m.l.] . . . is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury."[7]

We review the denial of a Rule 59(e) motion to alter or amend for abuse of discretion.[8]  We also review the denial of a motion for new trial for abuse of discretion; new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great weight of the evidence.[9]  And we review evidentiary rulings for abuse of discretion, but even then we will reverse only if the erroneous ruling affects a substantial right of a party.[10]  Finally, we review an award of attorneys' fees and costs for abuse of discretion.[11]

B.  UNLAWFUL, ILLICIT, OR IMMORAL PURPOSE

Parker argues that, in light of the jury's determination that

---

[6]Omnitech Int'l v. Clorox Co., 11 F.3d 1316, 1323 (5th Cir.), cert. denied, 513 U.S. 815, 115 S. Ct. 71, 130 L. Ed. 2d 26 (1994).

[7]Id. (quoting In re Letterman Bros. Energy Sec. Litig., 799 F.2d 967, 972 (5th Cir. 1986), cert. denied, 480 U.S. 918, 107 S. Ct. 1373, 94 L. Ed. 2d 689 (1987)).

[8]Martinez v. Johnson, 104 F.3d 769, 771 (5th Cir.), cert. denied, 118 S. Ct. 195, 139 L. Ed. 2d 133 (1997).

[9]Dawson v. Wal-Mart Stores, Inc. 978 F.2d 205, 208 (5th Cir. 1992).

[10]Marcel v. Placid Oil Co., 11 F.3d 563, 566 (5th Cir. 1994).

[11]Nickel v. Estate of Estes, 122 F.3d 294, 301 (5th Cir. 1997).

Davis actually continued to own the Campbell Wells stock transferred under the Act of Cash Sale & Assumption by virtue of Parker's oral promise to return Davis's stock on request, the evidence at trial conclusively established that the agreement was executed to place Davis's interest in Campbell Wells beyond the reach of his creditors. As such, urges Parker, the purported written-and-oral agreement, found by the jury to exist, cannot be enforced because it was entered into for the illicit purpose of defrauding Davis's creditors. Thus, concludes Parker, Davis can recover nothing under the agreement and the jury verdict cannot be permitted to stand.

In support of his argument, Parker invites our attention to several Louisiana cases from the nineteenth century that stand for the proposition that contracts executed for the purpose of defrauding creditors are unenforceable.[12] These cases were decided

---

[12]See Meyer v. Farmer, 36 La. Ann. 785 (1884); Bernard v. Auguste, 1 La. Ann. 69 (1846) (dismissing plaintiff's rescission action —— brought on ground that defendant's failure to give consideration for transfer of plaintiff's property rendered sale a simulation —— based on evidence that plaintiff was only titleholder of property, true owner having purchased property in plaintiff's name to screen it from creditors); Puckett v. Clarke, 3 Rob. 81 (1842) (holding that plaintiff could not recover property from defendant when the two had arranged defendant's purchase of property at a sham sheriff's sale with understanding that defendant would return property to plaintiff after danger of seizure by plaintiff's creditors had subsided); Gravier's Curator v. Carraby's Ex'or, 17 La. 118, 127 (1841) (refusing to enforce agreement and denying plaintiff's recovery of property conveyed to defendant as security for defendant's loans where parties held out conveyance as transfer of title for purpose of concealing property from plaintiff's judgment creditors).

under the rationale that courts of law will not give effect to contracts having an unlawful or immoral purpose.[13] As courts will not mediate disputes "between joint venturers in iniquity,"[14] the parties to such contracts have no recourse at law against one another. Under the Roman Law maxim, "In pari causa turpitudinem potior est conditio possidentis"[15] — in case of equal wrongdoing, the one in possession is in a better position — courts will "leave [the] property where the dishonest acts of the parties have placed it."[16]

Parker argued to the district court that this line of cases bars recovery under the well-known "unclean hands" canon which devolved from English equity: "One who has unclean hands or is

---

[13]Boatner v. Yarborough, 12 La. Ann. 249, 251 (1857) ("The law, whose mission is to right the innocent and to enforce the performance of licit obligations only, leaves parties who traffic in forbidden things and then break faith with [one another], to such mutual redress as their own standard of honor may award."); Bernard, 1 La. Ann. at 70 ("[C]ontracts prohibited by law, or contrary to good morals or public order, can have no effect."); Gravier's Curator, 17 La. at 127 ("[A]n obligation without a cause or with a false or unlawful one can have no effect.").

[14]Boatner, 12 La. Ann. at 251; see also Gravier's Curator, 17 La. at 131 ("[C]ourts of justice are not reduced to the humiliation of adjusting among dishonest men the results of their unholy speculations or of protecting one party against another while engaged in a common purpose, at war with the best interest of society and subversive of public order.").

[15]LA. CIV. CODE ANN. art. 2033, cmt. (c) (West 1987); see also Gravier's Curator, 17 La. at 127 ("[W]here both parties are charged with the same turpitude[,] the law gives no action [and,] . . . [i]n such cases[,] the maxim is 'Impari causa turpitudinus potior est causa possidentis.'").

[16]Bernard, 1 La. Ann. at 71.

12

himself a wrongdoer should not be able to benefit from the concurrent wrongdoing of another."[17] Although a rudimentary version of the Anglo-American concept of unclean hands (which became a common law doctrine as a result of the merger of law and equity) appears to have seeped interstitially into Louisiana's Civil Law system,[18] at least nominally so, the extent to which it has been embraced as a substantive maxim of Civil Law is uncertain at best.[19] And, to the extent that the courts of Louisiana have conflated the Anglo-American unclean hands canon with the Civil Law notion that neither party to an unlawful or immoral agreement may seek

---

[17]Vidrine v. Michigan Millers Mut. Ins. Co., 268 So. 2d 233, 239 (La. 1972).

[18]See Thomason v. Thomason, 355 So. 2d 908, 910 (La. 1978) (noting that the doctrine of recrimination — barring recovery by either party to a domestic dispute when both parties are equally at fault — is "based on the equitable idea that he who comes into court with unclean hands cannot obtain relief"); Rhodes v. Miller, 179 So. 2d 430, 431 (La. 1938) ("[C]ourts will not relieve a litigant who appeals for relief with unclean hands."); Coker v. Supreme Indus. Life Ins. Co., Inc., 43 So. 2d 556, 559 (La. Ct. App. 1950) ("It is axiomatic in our jurisprudence that equity will not aid one who comes into court with unclean hands. The line of decisions confirming this maxim is unbroken and too well known to need citation here.").

[19]See Poole v. Guste, 262 So. 2d 339, 345 (La. 1972) (noting that "limitations to the remedy of equity recognized in common-law jurisdictions . . . are not necessarily applicable to Louisiana, with its different civilian procedural background" and rejecting defendants' argument that plaintiffs' unclean hands barred injunctive relief); Bramblett v. Wilson, 413 So. 2d 600, 602 (La. Ct. App. 1982) ("It is questionable that the so-called 'clean hands' doctrine, an equitable common law theory, has any application in our civilian jurisdiction.").

13

enforcement in a court of law,[20] the doctrine occupies a unique niche in Louisiana as a defense to actions ex contractu: It bars legal recovery.[21]

However this hybrid doctrine is characterized, though, it is now firmly ensconced in Article 2033 of Louisiana's Civil Code, which provides, in pertinent part:

> [A] performance rendered under a contract that is absolutely null because its object or its cause is illicit or immoral may not be recovered by a party who knew or should have known of the defect that makes the contract null. The performance may be recovered, however, when that party invokes the nullity to withdraw from the contract before its purpose is achieved and also in exceptional situations when, in the discretion of the court, that recovery would further the interest of justice.[22]

---

[20]See Spearman v. Willson, 99 So. 2d 31, 33 (La. 1958) (likening the principle of law under which neither party to an agreement designed to hide property from creditors to prevent its seizure can seek judicial relief to "leaving the parties in the same position [the court] found them on the theory that both plaintiff and defendants have unclean hands") (emphasis added); Bernard, 1 La. Ann. at 71 ("[W]e leave the property where the dishonest acts of the party have placed it. Whoever claims it hereafter, must come before us with clean hands.") (emphasis added).

[21]See Poole, 262 So. 2d at 345 (noting that the defense of unclean hands is a "[limitation] to the remedy of equity recognized in common-law jurisdictions, based on the historical use in them of injunctions by the chancery court where the damage-remedy in the regular courts was inadequate"); Terrebonne Parish Police Jury v. Kelly, 428 So. 2d 1092, 1093 (La. Ct. App. 1983) ("The doctrine of 'clean hands' is an equity principle that requires that 'he who comes into a court of equity must come with clean hands.'") (quoting City of New Orleans v. Levy, 98 So. 2d 210, 218 (La. 1957)).

[22]LA. CIV. CODE ANN. art. 2033 (West 1987).

14

Inasmuch as simulated transfers designed to defraud creditors are absolute nullities,[23] Article 2033 codifies the line of cases relied on by Parker for his "unclean hands" defense.[24]

Davis attacks the applicability of Article 2033 here on the ground that simulated transfers are not, in fact, absolute nullities. He argues that Parker may not avail himself of Louisiana's extant version of the unclean hands doctrine because agreements in fraud of creditors produce only relative nullities.[25] Davis maintains that, as a matter of statutory construction, transactions that prejudice creditors by transferring assets to third persons cannot be "absolutely null" because the Civil Code provides defrauded creditors with specific remedies — the revocatory action for cases of actual transfers to third parties;

---

[23]See LA. CIV. CODE ANN. art. 2030 (West 1987) ("A contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral."); Succession of Webre, 172 So. 2d 285, 288 (La. 1965) ("Since the property has never left the patrimony of the ostensible seller, a simulated sale is an absolute nullity."); Spearman, 99 So. 2d at 33 (noting that agreements designed to hide property from creditors to prevent its seizure are contra bonos mores and unenforceable); Gast v. Gast, 19 So. 2d 138, 140 (La. 1944) ("[A fraudulent simulation] is not in reality a contract; it is a mere pretense, a sham, a disguise, the purpose of which is to defeat the rights of creditors with respect to the debtor's property; it is an absolute nullity.").

[24]See LA. CIV. CODE ANN. art. 2033, cmt. (a) (West 1987).

[25]See LA. CIV. CODE ANN. art. 2031 (West 1987) ("A contract is relatively null when it violates a rule intended for the protection of private parties, as when a party lacked capacity or did not give free consent at the time the contract was made.").

15

the action to declare a simulation for cases of feigned transfers.[26]
The Code's specific provision of a remedy for feigned transfers
would be mere surplusage, argues Davis, if fraudulent transactions
produced absolute nullities: Any creditor would already have
standing —— by virtue of such transaction's absolute nullity[27] ——
to have the court declare the transaction null.

Davis's argument would appear unmeritorious in light of the
pronouncements of the Supreme Court of Louisiana in Gast v. Gast.[28]
We need not, however, decide whether the interplay among some
modern provisions of the Code affects the enforceability of

---

[26]See LA. CIV. CODE ANN. arts. 2025, 2036 (West 1987).

[27]See LA. CIV. CODE ANN. art. 2033 (West 1987) ("Absolute nullity
may be invoked by any person. . . .").

[28]The Gast court noted that feigned transfers in fraud of
creditors are absolute nullities, notwithstanding the co-existence
of the declaration of simulation remedy:

> [T]here is a vast and clear distinction
> between a fraudulent simulation and a real
> contract made in fraud of creditors. The
> former is not in reality a contract; it is a
> mere pretense, a sham, a disguise, the purpose
> of which is to defeat the rights of creditors
> with respect to the debtor's property; it is
> an absolute nullity. The creditor may
> disregard the fraudulent simulation entirely
> and seize the affected property under
> execution, or he may resort to the action en
> declaration de simulation. But a real
> contract, although fraudulently entered into,
> cannot be so disregarded by the creditors. No
> matter how fraudulent, it must be set aside by
> a judgment; and for this purpose the
> revocatory action is provided.

Gast, 19 So. 2d at 140 (emphasis added) (citations omitted).

16

simulated transfers as between the parties to such agreements, for we conclude that Parker's unclean hands defense fails on other Article 2033 grounds.

By its terms, Article 2033 does not bar recovery unless —— in addition to the absolute nullity prerequisite —— (1) the party seeking enforcement entered into the agreement with knowledge of its improper nature, and (2) the parties achieved their improper objective.[29]  In its verdict, the jury found that Davis did not enter into the asset transfer agreement for an unlawful, immoral or illicit purpose.  We cannot say that, in its denial of Parker's alternative motion for j.m.l. or new trial, the district court's implicit determination that the jury's conclusion is not against the great weight of the evidence constitutes an abuse of discretion, which would require reversal and the grant of a new trial.  Neither can we say that the evidence points so strongly in favor of a scienter finding against Davis that reasonable jurors

---

[29]See supra note 22 and accompanying text.  Contrary to Parker's assertions otherwise, Article 2033 does not appear to have altered the Civil Law's pre-codification treatment of unlawful contracts; scienter and successful attainment existed as prerequisites to barring recovery before Article 2033 was enacted. See LA. CIV. CODE ANN. art. 2033, cmts. (a), (d) & (e) (West 1987); Gravier's Curator, 17 La. at 127 ("By the Roman law right to recover back what had been paid on an illicit contract depended upon the question which of the parties was dishonest or whether both were chargeable with the same turpitude.  If the party who had received were alone dishonest the sum paid could be recovered back even though the purpose for which it was given had been accomplished.") (emphasis added); Id. at 127-128 ("These principles apply in cases where the corrupt or reprobated contract has had its effect . . . .") (emphasis added).

would have to conclude that he knew of the illicit purpose of the transfer, which would require reversal and the grant of a j.m.l.

As evidence that Davis's motive for executing the asset transfer agreement was to hide his Campbell Wells interest from his creditors, Parker relies on Davis's intentional failure to (1) list his Campbell Wells interests on financial statements submitted to creditors, including the IRS, the FDIC, and Guaranty Bank; (2) report his beneficial interest in Campbell Wells on his 1986-1994 tax returns;[30] and (3) disclose his Campbell Wells interests during debt reduction negotiations with a number of his creditors.[31]

The district court, however, found sufficient support for the jury's verdict in the evidence that Parker initiated the asset transfer scheme, inducing Davis to divest his interests in Campbell Wells based on the Parker-generated specter of a potential judgment creditor's attempting to seize that interest. According to Davis's testimony, Parker, in his capacity as attorney for Davis, accompanied him to a meeting called by the general partner of Preferred Properties, a real estate development company in which

---

[30]Davis reported substantially diminished or negative taxable income on these returns, as well as creditor forgiveness of substantial debt obligations that he was unable to meet. Parker contends that had Davis disclosed his Campbell Wells interest in the insolvency calculations he used to avoid the payment of taxes on phantom income from the forgiveness of debt, his tax liability would have been different.

[31]This nondisclosure, urges Parker, gave Davis greater leverage with which to negotiate favorable settlements and enabled him to persuade the FDIC to abandon the prosecution of a $3 million collection suit.

18

Davis had invested.  Preferred Properties had borrowed heavily to finance one of its projects, but the project failed to produce enough cash flow to service its debt obligations.  At the meeting, investors were asked to make supplemental contributions sufficient to service the loan that was secured by a mortgage on the company's property.  Several partners announced that they were filing for bankruptcy and thus would not be able to make any contributions toward the partnership's obligations.  When Davis — whose own financial situation was deteriorating — indicated that he too would be unable to contribute, one of the partners became upset and openly hostile towards the other members of the investment group and Davis in particular.

Davis testified that after the meeting Parker advised him that the disgruntled partner could try to seize Davis's assets, depriving him of resources with which to pay his other creditors. At the time, Davis's interests in Campbell Wells was the only one of his business holdings that had a significant value; the company was netting approximately $100,000 per month.  Davis averred that Parker offered to take title to Davis's stock and apply Davis's share of the company's revenues towards their substantial mutual debt.[32]  In this way, rather than losing his sole income-generating asset to one anxious creditor, Davis would retain the possibility

---

[32]Parker and Davis, as business partners, owed — in addition to their Campbell Wells indebtedness — some 2.6 million dollars in joint indebtednesses on various investments.

19

of recovering from his financial straits by satisfying most, if not all, of his creditors. As such, stated Davis, his purpose in entering the asset transfer agreement was to pay his creditors, not to defraud them. The jury obviously believed him; whether we or the trial judge would have is of no moment.

Parker admitted at trial, via impeachment, that the asset transfer agreement was discussed in these terms, but denied that the agreement was ultimately confected for the purpose of preserving the stock's income-generating potential for Davis. Instead, testified Parker, the two settled on an outright exchange —— Davis transferred his interests to Parker in full ownership, and Parker assumed Davis's proportionate share of the debts incurred in the Campbell Wells acquisition. Parker would not deny, however, that he originally approached Davis with the asset transfer proposal, not vice versa; and conceded that both parties understood that any proceeds from the transferred assets were to be applied to their joint debt.

Davis posits that Parker's version of the nature of their agreement is implausible because Davis was never concerned that he might be called on to meet his own obligations as guarantor on the loans with which the Campbell Wells acquisition had been financed: The company was making more money than it needed to service its notes, so Davis had no incentive to trade his interests for the assumption of his share of the company's debt by Parker. It appeared quite likely to all concerned that those debts would be

timely and fully satisfied out of the company's earnings, and unlikely that, even if there were a default, a foreclosure sale would not produce sufficient proceeds to cover the debts and thus make unnecessary the payment of deficiencies by the shareholders under their personal guaranties. Indeed, Davis saw the venture's profitability as a means of satisfying the debts he had incurred on other ventures as well.[33]

In addition to the evidence of Parker's inducement, the district court, in refusing to render a j.m.l., relied on the fact that Parker had represented Davis in a legal capacity throughout the attempted work-out of Davis's debts. His ex-wife, Jeanne Davis, apparently handled all the paper work associated with her husband's finances. She testified that in connection with the work-out of Davis's bank debt,[34] Guaranty Bank had given her a blank form to use in furnishing information on Davis's financial

---

[33]Parker contested Davis's characterization of his Campbell Wells stock. At trial, Parker referred to the investment as a "touch and go" concern, the success of which was far from certain. The jury was presented with ample evidence to the contrary: The financial statements for Campbell Wells indicated that, prior to its acquisition, the company had approximately $500,000 in accounts receivable and cash, and was netting approximately $90,000 per month in earnings; Parker responded affirmatively when asked whether the company was well on its way to success when the Campbell Wells deal was closed; six weeks after the purchase, the financial statements reflected shareholder equity in the amount of $1,101,554; the pro forma submitted to Guaranty Bank in conjunction with the loan application projected $2,390,000 in profit for the first full year of operation following the company's purchase; and its five-year projection totaled $21,511,000 in profit.

[34]Davis had obtained loans from the bank to finance several ventures that ultimately failed.

condition. She further testified that when she asked Parker whether the Campbell Wells interest should be included on the bank's financial statement form under the heading "assets held in trust," Parker instructed her to discard the bank's form and gave her an alternative form that did not contain a similar entry space. She stated that Parker advised her that Davis's Campbell Wells interests need not be included on the substituted form as the stock was not in Davis's name and there "was nothing in writing."

Ms. Davis also testified that she considered Parker's instruction to be legal advice, and that she felt safe in assuming that Parker would give her sound advice inasmuch as he was also an attorney for Guaranty Bank — the institution to which the financial statement was to be submitted. Mr. Davis testified that he ratified the decision to omit his interests from the statement for the same reasons.

Based on the testimony adduced at trial, the jury could reasonably have concluded that Davis relied on Parker's counsel — legal, business, and personal — for the legitimacy of their mutual actions. In the light most favorable to the verdict, the evidence supports the conclusion that Parker's advice was born out of his own self-interest — keeping outsiders from becoming involved in the Campbell Wells venture, if nothing else — and that he manipulated Davis to further that self-interest.[35] In

---

[35]According to Davis's testimony, Parker took advantage of their mutual trust in dictating the nature of and circumstances

22

surrounding their transaction:

Q:    What confidence did you have in Mr. Parker as your attorney
when you transferred your Campbell Wells interest to him on
February 3rd, 1986?

* * *

A:    I had complete confidence in Mr. Parker.

Q:    And how was that confidence built over the years?

A:    It was built through trust, through business relationships,
through conversations, through social activities, through things we
did together and through practices that — things that we
discussed, and I think that Mr. Parker, as far as I was concerned
at the time, was an extremely competent attorney.

* * *

Q:    Okay.   What discussions did you have with Mr. Parker about
having a writing in the side so that you could show later on that
he was holding the shares for you to be returned?

A:    Are you talking about a counter letter?

Q:    A counter letter.

A:    Well, I asked Mr. Parker about that, and he says, no, there's
no way that we can do a counter letter.

* * *

Q:    The [Act of Cash Sale & Assumption] says that Mr. Parker
assumed your obligations at Guaranty Bank, is that right?

A:    Yes, sir.

Q:    And you said earlier that there was no discussion about a
release of yourself from the Guaranty Bank obligation pertaining to
Campbell Wells.   What discussion was ever had that he was going to
assume your obligations at the bank?

A:    No discussion of that at all.

Q:    And would you state whether you ever read from the document?

23

A:     No, sir.  I trusted Mr. Parker.  I went in, I signed the document and I left.

Q:     And would you state whether Mr. Parker ever sent you a copy of that document until this lawsuit was filed?

A:     No, sir, he did not.

Q:     Okay.  Would you state why you didn't read the document?

A:     Well, because Mr. Parker, I thought, was looking out for my best interest.  I had a lot of confidence in him, and we had made this agreement on what we were going to do, and I just didn't feel like it was necessary that I had to read it.

Q:     Reference is made in that document to a thousand dollar cash payment.  Would you state whether any amount of money was paid to you?

A:     Did he pay me anything?

Q:     Yes.

A:     No, absolutely not.

Q:     What conversations, if any, did Mr. Parker ever make as to what the contents of that document were?

A:     Nothing.  We never discussed it.

Q:     Okay.  What comments did Mr. Parker make to you regarding any adverse interest or conflict of interest that he would have preparing this as your attorney and asking you to sign it?

A:     He never discussed that with me at all.

Q:     What conversation did Mr. Parker have with you about the disadvantage or any consequences that might result if you signed this document without a counter letter?

A:     We never discussed that situation at all.

Q:     What statements, if any, did he make to you, and I'm speaking of Mr. Parker, that it might not be in your best interest to sign this document?

A:     He never informed me anything like that.

24

addition, the jury was presented with evidence that, during the time that his Campbell Wells stock was held in Parker's name, Davis paid off some of his debts with assets that were exempt from seizure.[36] From the fact that Davis took measures beyond those mandated by the law to resolve his indebtednesses, the jury could

Q: What advice did Mr. Parker give you that you should hire another attorney to review this document before you signed it?

A: Mr. Parker never advised me that I should even think about getting another attorney or get another attorney, and if he had been advising me to get another attorney, then I would not probably have signed this document at all.

In addition, circumstantial evidence of Parker's true motive is found in the actions he took following the execution of the Act of Cash Sale & Assumption. Under the written agreement, Parker only assumed Davis's proportionate share of the Campbell Wells debt; i.e., Davis remained personally liable to Guaranty Bank and the Campbells but, by virtue of the assumption, Parker became liable to Davis for any creditor judgment against him on the notes. Shortly after the assumption, however, Parker — who was also Guaranty Bank's attorney — acted within the bank to have Davis released from his liability on the Campbell Wells loan. Davis testified that Parker never discussed the possibility of obtaining a release with him, and that he only mentioned it in passing after the fact.

This move is telling in light of the fact that Guaranty Bank included a cross-collateralization provision in its loan instruments. Under that provision, the bank was entitled to execute on the collateral put up for any loan that the debtor had with the bank should the debtor default on a given loan. The jury reasonably could have inferred from Parker's actions that his true concern was with preventing creditors from seizing Davis's Campbell Wells interest and interfering with the venture inasmuch as (a) Davis had multiple loans with Guaranty Bank that were in danger of going into default, and (b) Parker took no comparable action with respect to Davis's liability on the Campbells' promissory note.

[36]Ms. Davis testified that she and her husband paid creditors with the equity (approximately $200,000) in their retirement fund and life insurance policies. Davis also sold his home in Texas to satisfy a tax lien that the IRS had placed on the house.

25

reasonably have inferred that he did not enter the asset transfer agreement with the intent to defraud creditors.  It follows that the district court did not err reversibly in refusing to grant Parker a j.m.l. on the basis of his unclean hands defense.

C.    ENFORCEMENT OF ORAL AGREEMENT

In its answer to the first interrogatory, the jury found that the Act of Cash Sale & Assumption in and of itself was not a valid contract expressing the true intent of the parties; rather, it was a simulation.  The jury further determined that Davis was operating under an error about the nature and terms of that contract and would not have entered it had he been aware of his error; and that Parker induced Davis to enter that contract through fraud.  The jury concluded nonetheless that a contract (written transfer of title combined with oral obligation to retransfer) did exist between the parties — a contract whereby Parker agreed to hold and return Davis's Campbell Wells stock — which Parker breached when he refused to return the stock to Davis.

In addition to his claim of unenforceability grounded in the unclean hands doctrine, Parker contends that even if such an oral retransfer agreement existed, it is not enforceable under Louisiana law because it is vague.[37]  Also, Parker insinuates that admitting

_____

[37]Parker relies on Conkling v. Turner, 18 F.3d 1285, 1301-03 (5th Cir. 1994)(alleged oral contract for stock redemption failed for lack of a definite price), in making this contention.  He insists that the alleged agreement is vague in that Davis provided no testimony about the details of this purported agreement and did not specify whether Parker was entitled to any compensation for

26

oral testimony to prove the retransfer provision violated Louisiana's specific statute of frauds for sales of securities as it stood at all pertinent times.[38]

Regarding vagueness, Parker urges that an agreement under which he would simply "hold" the stock "in trust" for an unspecified time and return it to Davis on request is too vague to be enforceable. Regarding enforcement of an oral agreement to sell

---

allegedly "holding" the stock. Parker further comments that there was no agreement as to the payment of taxes, distribution of dividends, liability for debts, or the consequences of bankruptcy, should it occur.

[38]See LA. REV. STAT. ANN. § 10:8-319 (West 1993)(stating that a contract for the sale of securities is not enforceable unless there is some signed writing), repealed by Acts 1995, No. 884, § 1, eff. Jan. 1, 1996; see also Levinson v. Charbonnet, 977 F.2d 930 (5th Cir. 1992)(refusing to enforce oral agreement to sell stock); Morris v. People's Bank & Trust Co. of Natchitoches, 580 So. 2d 1037 (La. Ct. App. 1991)(applying statute of frauds to private agreement to buy bank stock). As a preliminary matter, we observe that this court has applied section 8-319 to oral agreements to sell stock. Charbonnet, 977 F.2d at 932-33. In that case, we commented that there appeared to be some "confusion in the Louisiana case law concerning whether R.S. 10:8-319 modifies or restricts the Louisiana Civil Code provisions that provide for the enforceability of oral agreements to buy and sell corporeal and incorporeal moveables," as three Louisiana courts of appeal decisions, relying on the Civil Code, had validated oral agreements for the sale of securities. As those cases failed to mention section 8-319, we determined that they did not intend to undermine its validity. We further noted that another Louisiana court of appeal affirmed the validity of section 8-319 and reconciled any apparent conflicts between the Civil Code and that provision. We concluded that the Louisiana Supreme Court would uphold the validity of section 8-319, were it presented with the Charbonnet case. Id. We observe in passing that section 8-319 has been repealed and a sale or purchase of securities no longer requires a writing in the traditional sense. Section 8-113 now provides: "A contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed . . . ." LA. REV. STAT. ANN. § 10:8-113 (West Supp. 1998).

27

stock, Parker argues —— in anticipation of Davis's contention that the contract was not a "sale" and therefore does not fall within the coverage of the statute of frauds —— that the contract cannot stand as anything other than a sale. In any event, continues Parker, if it was not a sale, it had to be either a gratuitous donation or a trust. In either case, contends Parker, the district court erred when it entered judgment on the jury's verdict, as the agreement was neither in authentic form as required for a valid gratuitous donation,[39] nor in a form required by the applicable provisions of the Louisiana Trust Code for the creation of a trust.[40]

As Parker anticipated, Davis countered that the statute of frauds for securities is inapplicable, as it proscribes oral agreements to <u>sell</u> securities, not oral agreements to <u>hold and return</u> them. Davis maintains that the jury rejected Parker's contention that the transaction was intended to be a sale, finding instead that a contract existed "whereby Parker agreed to hold and return Campbell Wells stock to Davis." Davis insists that, as the

---

[39]<u>See</u> LA. CIV. CODE ANN. arts. 1523, 1536 (West 1987). <u>See also</u> LA. CIV. CODE ANN. art. 1539 (stating that manual gifts are not subject to any formalities). Although the authentic act is not required for gratuitous transfers of corporeal movables, shares of stock have been held to be incorporeal movables and thus insusceptible of being donated manually. <u>See, e.g.</u>, <u>Primeaux v. Libersat</u>, 322 So. 2d 147 (La. 1988) (citing <u>Succession of McGuire</u>, 151 La. 514, 92 So. 40 (La. 1922), and <u>Succession of Sinnot v. Hibernia Nat'l Bank</u>, 105 La. 205, 30 So. 233 (La. 1901)).

[40]<u>See</u> LA. REV. STAT. ANN. § 9:1752 (West 1991).

transaction was not a sale, it was an "innominate contract" in which, for the consideration of Parker's attempting to discharge a joint indebtedness, Davis agreed to place the stock in Parker's name for his use in discharging debt, after which Parker would return the stock to Davis. Moreover, continues Davis, as no price was contemplated in either of the two steps of the transaction, it could not be a sale.

Davis continues by arguing that the agreement is neither a gratuitous donation nor a trust. He concedes that in his testimony he used the phrase "in trust" to describe the nature of Parker's precarious possession, but explains that he used those words in the non-technical sense and that it was never his contention that either a formal or constructive trust relationship had been created. Davis acknowledges that the stock was placed in Parker's name intentionally, but insists that the stock thus transferred remained subject to Parker's obligation to return it to Davis at a future date. Neither was the agreement a gratuitous donation, continues Davis, as it transferred the stock to Parker for the purpose of facilitating his management of Davis's affairs with his creditors and to prevent Davis's stock from finding its way into the hands of third parties who might interfere with the original foursome's unfettered control of Campbell Wells. And, of course, Davis disputes Parker's contention that the oral agreement was too vague to be enforceable.

29

Finally, Davis advances that even if the statute of frauds were applicable to prevent enforcement of the oral retransfer aspect of the agreement, any error with regard to the jury's finding of breach of contract is harmless and does not require that the judgment in Davis's favor be reversed. This is so, he posits, because his case was submitted to the jury on multiple alternative theories of recovery — breach of contract, breach of fiduciary duty, detrimental reliance, and fraud[41] — each of which was addressed in special interrogatories. With the exception of detrimental reliance, the jury found for Davis on each alternative theory submitted. (The jury failed to reach detrimental reliance because its affirmative finding on the existence of a contract mooted the detrimental reliance issue.)

We conclude that the jury's determination that the written asset transfer agreement was a simulation — a contract which, by mutual agreement, does not express the true intent of the parties inter se — is supported by the evidence apparently credited by the

---

[41]In instructing the jury on the law applicable to the case, the court stated that "the plaintiff, William Davis, has asserted four separate causes of action against the defendant, Ernest Parker; breach of contract, breach of fiduciary duty, detrimental reliance and fraud." In addressing the breach of contract claim, the court explained that "[c]onsent may be invalidated by error, fraud or duress." The court continued, "Davis asserts error existed as to the principal cause of the contract in this case . . . ." Later, when addressing the fraud claim, the court noted that "[c]onsent to a contract can also be destroyed by fraud or misrepresentation."

30

jury.[42]  This is the legal and factual essence of Davis's position, regardless of whether he has advanced it crisply or artfully, when he continually insists that the agreement he entered into with Parker was not a sale but rather an arrangement whereby Parker was to hold and later return the stock to him.  Davis maintains, quite simply, that he remained the true owner of the stock despite the transfer of legal title pursuant to the written agreement confected between the parties to the contrary.

"[A] transaction will not be set aside as a simulation if any consideration supports the transaction because the reality of the transference is thus established."[43]  In his appellate brief, Davis asserts that "no sale was contemplated, but a transfer, the consideration for which was not a price but the management of the

---

[42]See LA. CIV. CODE ANN. art. 2025 (West 1987); Fritscher v. Justice, 472 So. 2d 105, 107 (La. Ct. App. 1985) ("A simulation is a feigned or pretended sale clothed with the formalities of a valid sale."); see also Thompson v. Woods, 525 So. 2d 174, 178 (La. Ct. App. 1988) ("In order to determine whether or not a sale is simulated the court must determine whether the parties acted in good faith, whether there was an actual intention to transfer property, and whether any consideration was given for the transfer."); Peacock v. Peacock, 674 So. 2d 1030, 1033-34 (La. Ct. App. 1996) ("Two legal presumptions, one codal and one jurisprudential, apply in situations where a party seeks to prove a simulation . . . .  The jurisprudential presumption of simulation applies where the evidence establishes the existence of facts and circumstances which create a highly reasonable doubt as to the reality of the putative sale . . . .  When either codal or jurisprudential presumption exist, the burden of proof shifts to the other party to the sale who may rebut the presumption by establishing a good faith transaction, resulting in a true alienation of ownership for consideration.").

[43]Trident Oil & Gas v. John O. Clay Expl. Inc., 622 So. 2d 1191, 1193 (La. Ct. App. 1993).

31

asset for the benefit of the joint creditors of the parties." What Davis may have thought of subjectively as consideration does not matter; the issue is whether consideration was present as a matter of law. We conclude that it was not.

Neither the release of Davis from the Campbell Wells obligation at the Guaranty Bank nor the stipulation in the asset transfer agreement providing for a $1000 payment to Davis alters our view. Davis testified that he and Parker had no discussions before or at the time of the transfer regarding any wish by Davis to be released from the Guaranty Bank note.[44] Parker's testimony did not refute this; indeed, as he testified, the document itself does not call for him to obtain Davis's release from either the Guaranty Bank debt or the Campbell debt, much less expressly bind Parker to have Davis released. Parker further testified that (1) he did not think that Davis would have a right to force him to have Davis released from those debts; (2) he never told Davis that the document was tantamount to a release on the two debts; and (3) he had never stated to anyone else that Davis wanted to be released from the debt at Guaranty Bank. The fact is that Davis remained liable on the obligation to the Campbells until the Sanifill merger and never complained.[45]

---

[44]Davis also testified that he and Parker had no discussions regarding Parker's "assuming" Davis's obligations at Guaranty Bank, as provided for in the agreement.

[45]Parker does take the position, however, that he had "assumed" responsibility for the loan, and as such, Davis had rights against

32

As for the $1000, Davis testified that he was not paid any money. Parker himself testified that the $1000 was "not what the deal was about;" rather, "it was put in there . . . so there's not a property title question on the face of the document."[46]   On cross examination, one of Davis's trial attorneys inquired "let's get back to the case at hand that we're in court on . . . . [A]nd that is, the thousand dollars was not paid for the --."   Parker responded, "It may not have been.   I don't -- probably not."   Clearly, between the parties neither release from debt nor payment of the cash consideration was ever contemplated.   This is wholly consistent with simulation.

In opposing enforcement of the agreement to retransfer the stock, Parker implicitly challenges the propriety of allowing Davis to introduce parol evidence and thereby vary the terms of the written Act of Cash Sale & Assumption.   Louisiana Civil Code Article 1848 provides:

> Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature.   Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent, or a simulation, or to prove that the written act was modified by a

---

him.

[46]A curious explanation for a Louisiana lawyer ⸺ presumably referring to anachronistic jurisprudence on "serious consideration" ⸺ given that the immovable property in question was at all relevant times owned by either the corporation or the partnership and was never the object of a direct sale from Davis to Parker; and movable property is not subject to the laws of registry.

33

subsequent and valid oral agreement.[47] The nature of the simulation — absolute or relative — may determine whether the parties to the simulated act, or only third parties, may introduce such evidence.[48] A simulation is <u>absolute</u> when the parties intend for their act to produce no effects whatsoever between them;[49] it is <u>relative</u> when the parties intend for their act to produce some effects between them, even though such effects are not identical to those recited in their act.[50] A relative simulation produces the effects that the parties intend if all requirements for those effects have been met.[51] In the case of an absolute simulation, however, "the apparent transferor may not succeed in attacking [it] in the absence of a [written] counterletter."[52]

---

[47]LA. CIV. CODE ANN. art. 1848 (West 1987).

[48]<u>Id.</u> cmt. (c).

[49]LA. CIV. CODE ANN. art. 2026 (West 1987).

[50]LA. CIV. CODE ANN. art. 2027 (West 1987).

[51]<u>Id.</u>

[52]LA. CIV. CODE ANN. art. 2026 cmt. b (citing Thomas B. Lemann, <u>Some Aspects of Simulation in France and Louisiana</u>, 29 TUL. L. REV. 22, 30-31 (1954)); <u>see also</u> SAÚL LITVINOFF, 5 LOUISIANA CIVIL LAW TREATISE, THE LAW OF OBLIGATIONS § 12.97, at 399-400 (West 1992)("[R]egarding the use of testimonial proof as evidence of a simulation, the restrictions that remain concern only the parties to the simulation, as third persons may avail themselves of that kind of evidence to prove a simulation adverse to their interest.") (citing <u>Hampton v. Rubicon Chems., Inc.</u>, 436 So. 2d 1254 (La. Ct. App. 1983), <u>rev'd and remanded on other grounds</u>, 458 So. 2d 1260 (La. 1984)) <u>and</u> <u>In re Hacket</u>, 4 Rob. 290 (La. 1843)). The court in <u>Hampton</u> stated that "the parol evidence rule applies only to

34

Clearly, if the written agreement between Davis and Parker was a simulation it was relative. They intended for their act to produce some effects between them, and it did: The Campbell Wells stock theretofore registered to Davis was re-issued to Parker.[53] As such, it cannot be said that they intended that their written act have "no effect." But the jury credited Davis's contention that the transfer of the stock was only the first of two steps in this transaction, not the sole step. The second step was to be the return of the stock to Davis, reversing the effect of the first step, yet still not producing a "no effect" agreement. The district court, then, did not abuse its discretion in allowing Davis to introduce parol evidence to prove that the asset transfer agreement was indeed a simulation.[54]

But even if this were not the case, the parol evidence at

---

actions between the parties to the contract and their privies, not to actions between parties and third persons." Id. at 1260.

[53]Davis states in his appellate brief that he never contended that Parker's acquisition of the stock was not real or that the transaction was a mere sham; rather, Davis advances that Parker did acquire the stock, but subject to the obligation to reconvey it to Davis in the future. Moreover, Davis testified that "we discussed that a little bit . . . that he [Parker] would have the controlling interest in the company and access to some resources . . . if this is a worst comes to worst situation, he could pay him and I's notes with." Davis also testified that Parker said, "Bill, you can have it [Campbell Wells stock] back any time you want. I'll give it back to you."

[54]See LITVINOFF, supra, § 12.97, at 398 ("When the act contained in a written instrument is a relative simulation, that is, when the parties intend that their act shall produce between them effects different from those recited in the instrument, testimonial proof is admissible to prove their true intent.").

35

issue would be admissible, as Davis also sought rescission of the agreement based on two vices of consent — error and fraud.[55] Civil Code Article 1848 makes clear that testimonial evidence is properly admissible on questions of vice of consent.[56]

In the instant case, simulation and consent to permanent ownership by Parker are opposite sides of the same coin. The effect that the simulated transfer was to produce is not critical. Had it been intended to produce a trust, technical problems would have arisen, as Louisiana does not recognize a constructive trust,[57] and the written agreement clearly did not establish an express trust. In like manner, the relationship intended by the parties may have been correctly characterized as <u>mandate</u>, with Parker acting as Davis's agent or mandatary, as the district court appears

---

[55]<u>See</u> LA. CIV. CODE ANN. art. 1948 (West 1987)("Consent may be vitiated by error, fraud, or duress.").

[56]LA. CIV. CODE ANN. art. 1848 (West 1987); <u>see also</u> <u>Sonnier v. Boudreaux</u>, 673 So. 2d 713, 718 (La. Ct. App. 1996)("Although parol evidence is generally not admissible to vary or contradict the clear and unambiguous terms of an authentic act or written instrument, in the interest of justice, it may be admitted to prove a vice of consent."); <u>Smith v. Remodeling Serv., Inc.</u>, 648 So. 2d 995 (La. Ct. App. 1994)("[A] party to an authentic act who alleges that the act was executed through fraud, error or mistake may be permitted to introduce parol evidence to support such allegations.")(citing <u>Mitchell v. Clark</u>, 448 So. 2d 681 (La. 1984) <u>and</u> <u>Billingsley v. Bach Energy Co.</u>, 588 So. 2d 786 (La. Ct. App. 1991)).

[57]<u>Matter of Oxford Management, Inc.</u>, 4 F.3d 1329, 1336 (5th Cir. 1993); <u>Marple v. Kurzweg</u>, 902 F.2d 397, 399 (5th Cir. 1990).

to have construed it.[58]  Alternatively, Davis's delivery of his stock to Parker might properly be characterized as a deposit.[59]  Or together, the written-and-oral agreement might have created an innominate relationship that provided for Davis to "park" his stock with Parker for an indefinite — but not permanent — period and to reacquire it later.

Our exhaustive (and exhausting) review of the extensive trial record does not yield a single, precise Civil Law label for the relationship created between Davis and Parker.  Plainly, however, the jury credited Davis's evidence, which supports the existence of

---

[58]A mandate is "an act by which one person gives power to another to transact for him and in his name . . . ."  LA. CIV. CODE ANN. art. 2985 (West 1994), revised by Acts 1997, No. 261, § 1, eff. Jan. 1, 1998.  La. Civ. Code Article 2989 now provides that "[a] mandate is a contract by which a person, the principal, confers authority on another person, the mandatary, to transact one or more affairs for the principal."  LA. CIV. CODE ANN. art. 2989 (West Supp. 1998).  Significantly, a mandate (1) may be established by an oral or written agreement between the parties; (2) is gratuitous in nature, unless there is a contrary agreement; (3) may be revoked by the principal whenever he thinks it proper; and (4) binds the mandatary "to restore to his principal whatever he has received by virtue of his procuration."  LA. CIV. CODE ANN. arts. 2991, 2992, 3005, 3028 (West 1994) (revised 1997).  In denying Parker's motion to dismiss and/or motion for summary judgment on the breach of contract claim, the district court addressed the possibility of a mandate.  Record on Appeal, vol. 31, pgs. 12-29.

[59]"A deposit, in general, is an act by which a person receives the property of another, binding himself to preserve it and return it in kind."  LA. CIV. CODE ANN. art. 2926 (West 1994). Deposit is essentially a gratuitous contract, involving the delivery of movable property, which is created by the parties' mutual consent, whether actual or implied.  See LA. CIV. CODE ANN. arts. 2928, 2929, 2930, 2932, 2933 (West 1994).  Finally, "[t]he deposit must be restored to the depositor as soon as he demands it . . . ."  LA. CIV. CODE ANN. art. 2955 (West 1994).

a relative simulation consisting of an oral stipulation sufficient to vary the terms of the written agreement and prohibit full ownership of the stock from ever passing from Davis to Parker. Irrespective of the name by which this "rose" is called, though, the jury was convinced that it included an obligation by Parker to return the stock to Davis. Moreover, as the jury also found, Parker's failure to return the stock constituted a breach of that obligation. We conclude that the jury's findings regarding the existence of an oral covenant to retransfer the stock was neither unreasonable nor against the great weight of the evidence.

The written agreement could correctly be viewed as a simulation, with the true relationship involving a return of the stock, as the jury viewed it. Davis thus properly brings this action for breach of contract, seeking the return of his stock. This is truly no different in effect than seeking rescission of the written contract, either because of the simulation or because error or fraud vitiated Davis's consent. Stated differently, it is immaterial whether the relationship confected was a mandate, a deposit, or an innominate contract, for the result is the same: Each of these roads lead to Rome. Accordingly, the arrangement is not unenforceable so the district court did not commit reversible error in admitting the parol evidence or in denying Parker's motion for j.m.l. or new trial on this issue.

D. PRESCRIPTION

This case came before us in <u>Parker I</u> as an appeal from a grant of summary judgment in favor of Parker: The district court had dismissed Davis's suit as time-barred under Louisiana's one-year prescriptive period for legal malpractice actions.[60] In reversing and remanding, we held that (1) Davis's claims for rescission, breach of contract, and detrimental reliance do not come within the ambit of section 5605(A)'s provisions because they are not actions predicated on traditional legal malpractice, i.e., they do not concern the quality of legal representation; and (2) although, in a sense Davis's nullity claim does concern the quality of legal representation, it is not covered by the statute as the language of section 5605(A) limits the prescriptive period's application to "action[s] for damages" and the objective of a nullity action is ordinarily restoration in kind.[61]

Parker entreats us to revisit the prescription issue. He argues that, as a result of the manner in which Davis tried his case against Parker on remand, we are not bound by the law of the case doctrine.[62] Parker notes that Davis escaped dismissal in

_____

[60]LA. REV. STAT. ANN. § 9:5605 (West 1990). This is the version of section 5605 in effect at the time Davis filed his suit against Parker. The statute has subsequently been amended. <u>See</u> LA. REV. STAT. ANN. § 9:5605 (West 1998).

[61]<u>Parker I</u>, 58 F.3d at 188-90.

[62]<u>Reid v. Rolling Fork Pub. Util. Dist.</u>, 979 F.2d 1084, 1086 (5th Cir. 1992) ("The decision of a legal issue by an appellate court establishes the 'law of the case' and must be followed in all subsequent proceedings in the same case at both the trial and appellate levels unless the evidence at a subsequent trial was

Parker I by drawing a "fine distinction" between Parker's status as a businessman and his status as a lawyer. In other words, Davis represented that his claims for breach of contract, rescission, and detrimental reliance turned on Parker's actions in his capacity as Davis's business associate, not as his lawyer. This representation, urges Parker, led us to conclude in Parker I that Davis's claims had not prescribed because they are not traditional legal malpractice claims. But, contends Parker, having fashioned his case one way to avoid prescription, Davis proceeded on remand to paint an entirely different picture for the jury —— in essence, putting Parker's status and actions as an attorney on trial. In support of his argument, Parker cites a number of instances throughout the trial in which Davis purportedly placed improper emphasis on Parker's role as an attorney.

Although he is correct that Parker I hinged on the fact that Davis's claims had nothing to do with the quality of legal services rendered,[63] Parker misconstrues that decision insofar as he

_____

substantially different, the controlling authority has since made a contrary decision of law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.") (citing Schexnider v. McDermott Int'l Inc., 868 F.2d 717, 718-19 (5th Cir.), cert. denied, 493 U.S. 851, 110 S. Ct. 150, 107 L. Ed. 2d 108 (1989)).

[63]As we stated in Parker I:

> Although Parker's legal advice may have contributed to Davis' decision to transfer the stock to Parker, the stock could have been transferred to a non-lawyer and the same actions could have been brought against that

40

interprets it as a general gag order with respect to the subject of Parker's legal representation or his status as a lawyer in general and Davis's long-time lawyer in particular. The relevance of Parker's status as an attorney has never been questioned. The fact that Parker was Davis's attorney, as well as his business associate and trusted friend, was offered to explain how the asset transfer agreement came into being, and was essential to Davis's nullity action: It established the fiduciary duty on which the claim was predicated.[64] The gravamen of Parker's contention lies in the ostensibly improper manner in which Davis repeatedly presented

> party. That an attorney happens to be the transferee does not grant him the benefit of a one-year prescriptive period when a non-lawyer entering into the same agreement would be subject to a ten-year prescriptive period. Davis' fundamental complaint against Parker on [his breach of contract, rescission, and detrimental reliance claims] does not concern the quality of Parker's legal services; rather, Davis complains that Parker reneged on his promise to retransfer the Campbell Wells stock to Davis.

Parker I, 58 F.3d at 189.

[64]Davis argued at trial that the asset transfer agreement was entered into in violation of former Disciplinary Rule 5—104(A) of the Louisiana Code of Professional Responsibility, which provides: "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure." The Code's provision applied, notwithstanding its replacement with the Rules of Professional Conduct, because the conduct at issue occurred before the Rules' adoption. See Louisiana State Bar Ass'n v. Alker, 530 So. 2d 1138, 1139 n.2 (La. 1988).

41

evidence of Parker's profession, keeping that fact foremost in the jurors' minds at all times.

If Parker wished to complain that he was unfairly prejudiced by the emphasis placed on his status as an attorney, however, it was incumbent on him to object and request a limiting instruction,[65] which he never did. When viewed in context of the jury trial as a whole, though, Parker's lament rings hollow. Even though lawyers as litigants may labor under the disability imposed by the lawyer-bashing vogue of the times, the fact remains that subjective qualities of the parties litigant — age, education, sophistication, occupation, cultural background, and the like — are frequently relevant to the issues of the case. And that is certainly true of the instant litigation and the kinds of issues that it presents. We are bound by the law of the case, and we remain unconvinced that Davis's claims sound in malpractice.[66]

---

[65]Fruge v. Penrod Drilling Co., 918 F.2d 1163, 1168 (5th. Cir. 1990) (noting that "[w]here evidence is admissible for one purpose but not another, the burden is on the objecting party to request a proper limiting instruction" and that the issue is waived if no objection is made) (citing FED. R. EVID. 105).

[66]Parker also urges us to reconsider section 5605(A)'s application to Davis's nullity claim, arguing that the claim was a facade, given that restoration in kind was never a viable possibility. This argument was disposed of in Parker I, 58 F.3d at 191 ("Moreover, even if the court ultimately determines that damages are the only feasible remedy in this case, we are not persuaded that the Louisiana courts would adopt one prescriptive period in a nullity action for which restoration in kind is feasible and a different prescriptive period for a nullity action for which the court determines that restoration in kind is impossible.").

E.    REBUTTAL TESTIMONY

Parker urged his motion for j.m.l. or new trial, on the additional ground that the district court reversibly erred in permitting Davis to call two of Parker's former clients —— Kathleen Howard and Kenneth Guilbeau —— as rebuttal witnesses.  Howard and Guilbeau testified to specific actions taken by Parker in the course of representing them professionally.[67]  Parker insists that

---

[67]Guilbeau testified that Parker represented him in the negotiation of the terms under which replacement tenants were to assume Guilbeau's then-current tenants' obligations under a commercial lease.  In the drafting of the new lease, Parker omitted certain material terms but nonetheless obtained the parties' signatures by assuring everyone that he would complete the agreement later.

Howard testified that Parker represented her in divorce proceedings against her then-husband.  According to Howard, she retained Parker in April 1983, after Randy Prather and "Red" Dumesnil recommended him.  Prather was a loan officer with Guaranty Bank and Dumesnil was its president.  Prather and Dumesnil requested a meeting with Howard after discovering that she had filed for legal separation.  Her husband was delinquent on a note that he had given the bank in conjunction with a large loan.  Howard testified that Prather and Dumesnil expressed concern over how her separation would affect the loan, giving her the impression that she was responsible for half of her husband's note.  They arranged for her to meet with Parker even though she already had an attorney.  They did not disclose the fact that Parker also did legal work for Guaranty Bank.

On Parker's advice, Howard enlisted her daughter to obtain a power of attorney from her father so that Howard could pay off her husband's debts.  Even though the husband's note contained a cross-collateralization provision, the bank could not levy on the other funds that he had on deposit because they were not in his name —— they were in a corporate account.  After obtaining her father's power of attorney, Howard's daughter, under her mother's direction, withdrew the funds from the corporate account —— over $1,000,000 —— and put them in a CD in her father's name.  The bank then offset those funds against the note, pursuant to its cross-collateralization agreement.  Yet Parker never explained to Howard that she was under no legal obligation to pay off the note, and that by transferring the funds to a personal CD, she would be

43

their testimony was offered for the improper purpose of demonstrating his bad character via his alleged prior misconduct. As such, says Parker, their testimony constitutes "other acts" evidence that is inadmissible under Federal Rule of Evidence (F.R.E.) 404(b).[68]

Davis counters that the testimony of Howard and Guilbeau did not trigger F.R.E. 404(b), as it was offered for impeachment purposes pursuant to F.R.E. 608(b) and not as substantive evidence: Guilbeau contradicted Parker's testimony that he had never asked a client to sign an incomplete instrument on the assurance that he would fill in the details later; and Howard contradicted Parker's and Prather's testimony concerning the nature and extent of their relationships with one another and with Guaranty Bank.[69]

---

diminishing the value of the corporation in which she had a community property interest.

When Parker returned her file, she discovered — attached to a letter from her husband complaining to Dumesnil about what had happened — a handwritten note from Prather to Parker which read: "Ernie [Parker], what can I say? Another satisfied customer. Red was ticked off because Bobby [Howard's husband] didn't spell 'Dumesnil' correctly after all these years. s/Randy Prather."

[68]See FED. R. EVID. 404(b)("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.").

[69]Prather was a loan officer in Guaranty Bank's commercial lending department; he reviewed the loan application for the Campbell Wells acquisition and is now president of Premier Bank — Guaranty Bank's successor. Parker portrayed himself — in his own testimony and through Prather's testimony — as having a detached and strictly professional relationship with Guaranty Bank: He denied that he was acting in the capacity of the Bank's attorney when the Campbell Wells loan application was made, and Prather testified that, although Parker did some work for Guaranty Bank,

Parker nevertheless emphasizes that the rebuttal testimony cannot find shelter under F.R.E. 608(b), as that rule limits impeachment on collateral matters to cross-examination of the witness.[70] He contends that the Howard and Guilbeau testimony about their previous legal representations by Parker concerned collateral matters; as a result, he urges, it was inadmissible extrinsic evidence.

Parker's argument misses the mark with respect to Howard's testimony. That testimony suggests that Parker worked intimately — even collusively — with Prather and Guaranty Bank long before the Campbell Wells deal. As such, it contradicts Parker's portrayal of the relationships among himself, Prather, and Guaranty Bank,[71] which relationships are not collateral matters in

---

Jimmy Bean (Parker's partner) was the bank's true attorney; Parker testified that he was uncertain whether or not, prior to the Campbell Wells deal (September 1985), he had any direct business dealings with Prather; and both Parker and Prather denied that they were friends, claiming that their relationship was strictly professional in nature. According to Davis, Parker sought to mischaracterize Guaranty Bank's inner workings and Parker's role therein in an effort to portray the bank as the hapless victim of Davis's unclean hands.

[70]"Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence." FED. R. EVID. 608(b); United States v. Herzberg, 558 F.2d 1219, 1223 (5th Cir.), cert. denied, 434 U.S. 930, 98 S. Ct. 417, 54 L. Ed. 2d 290 (1977).

[71]See supra note 69.

this case.[72]  Moreover, her testimony casts doubt on Prather's objectivity by demonstrating a bias in favor of Parker; and witness bias is never immaterial.[73]

Parker's F.R.E. 608(b) contention does have arguable merit, however, with respect to Guilbeau's testimony.  Parker's alleged practice of having his clients execute incomplete instruments on the assurance that he would complete them later is not material to Davis's claims.[74]  As such, Guilbeau's testimony contradicting Parker would be admissible only if Parker had placed the alleged practice in issue on direct examination.[75]  Parker's testimony on

---

[72]See Head v. Halliburton Oilwell Cementing Co., 370 F.2d 545, 546 (5th Cir. 1967) ("The test for determining what is a collateral matter . . . [has been phrased]: 'Could the fact as to which error is predicated have been shown in evidence for any purpose independently of the contradiction?'") (citations omitted).

[73]See United Stated v. Abel, 469 U.S. 45, 56, 105 S. Ct. 465, 471, 83 L. Ed. 2d 450 (1984); United States v. Martinez, 962 F.2d 1161, 1165 (5th Cir. 1992) (noting that F.R.E. 608(b) does not prohibit the use of extraneous evidence "if it tends to show bias in favor or against a party") Parker further argues that the probative value of Howard's testimony in demonstrating bias is substantially outweighed by its prejudicial effect on the jurors. We cannot say, however, that the district court abused its discretion in admitting the testimony.

[74]Davis argues for materiality on the ground that "one of the issues central to Parker's defense was his contention that the [Act of Cash Sale & Assumption] signed by Davis should have been taken at face value, when the truth is that Parker sometimes told his clients, such as Guilbeau, that documents as signed do not always mean what they say."  We find Davis's argument unconvincing.

[75]See Jones v. Southern Pac. R.R., 962 F.2d 447, 450 (5th cir. 1992)(noting that "[l]itigants are . . . entitled to introduce extrinsic evidence to contradict a witness' testimony on matters that are material to the merits of the case" and that "if the opposing party places a matter in issue on direct examination,

46

the matter was elicited by Davis's counsel on cross-examination during Davis's case in chief, not by Parker's counsel. Thus, Guilbeau's testimony — extrinsic evidence — could not have been properly used to impeach Parker on the question whether it was his practice to obtain signatures on incomplete instruments — at best a collateral issue. Even so, any error resulting from the admission of Guilbeau's testimony was harmless. The plethora of other probative evidence adduced at trial militates against a finding of prejudicial effect.[76] We discern no reversible error in the district court's admission of this rebuttal testimony.

F.   NONPECUNIARY DAMAGES:  EMOTIONAL DISTRESS

The jury found by a preponderance of the evidence that Davis "suffered emotional distress, anguish or inconvenience which Parker intended to occur as a result of his refusal to return Davis's Campbell Wells stock." For this the jury awarded Davis $175,000, and the district court included this award in its judgment on the verdict. In his motion for j.m.l. or new trial, Parker challenged this jury finding as well, contending that there was no evidence to support nonpecuniary damages for emotional distress. The district

_____

fairness mandates that the other party can offer contradictory evidence even if the matter is collateral" but that "a party cannot delve into collateral matters on its own initiative and then claim a right to impeach that testimony with contradictory evidence").

[76]See F.D.I.C. v. Mijalis, 15 F.3d 1314, 1318-19 (5th Cir. 1994) ("We will not reverse a district court's evidentiary rulings unless they are erroneous and substantial prejudice results. The burden of proving substantial prejudice lies with the party asserting error.").

court disagreed, stating broadly —— and, we must note, conclusionally —— that "there is an adequate amount, and in some cases overwhelming amount, of evidence to support all of the jury's findings . . . ."

Louisiana Civil Code Article 1998 permits recovery of damages for non-pecuniary loss associated with a breach of contract under only two, narrowly restrictive circumstances: (1) "When the contract . . . is intended to gratify a non-pecuniary interest and . . . the obligor knew, or should have known, that his failure to perform would cause that kind of loss"[77] and (2) "[r]egardless of the nature of the contract[,] . . . when the obligor intended, through his failure, to aggrieve the feelings of the obligee."[78]

Parker offers two reasons why the district court erred in allowing the jury's emotional distress award to stand. First, regarding Civil Code Article 1998(i), he observes that the nature of the contract at issue was not to gratify a nonpecuniary interest and that there was no showing that he knew or should have known that Davis was susceptible to such an injury for breach of the agreement —— if indeed he was. Parker points to two cases which he reads as holding that stock transfer agreements lack any intent to gratify a non-pecuniary interest.[79] Second, Parker urges that there

---

[77]LA. CIV. CODE ANN. art. 1998 (West 1987).

[78]Id.

[79]Parker first invokes our decision in Stephenson v. Paine Webber Jackson & Curtis, Inc., 839 F.2d 1095 (5th Cir.), cert.

48

is inadequate evidence in the record that Davis in fact experienced any emotional distress. Parker observes that the only modicum of evidence supporting mental distress is the bare, conclusional testimony of Davis that "[t]his is very traumatic for me, I promise you that." Moreover, there was no confirmation by Davis's former wife that he suffered such distress, continues Parker, and no record of Davis's having consulted with a mental health professional about emotional problems.

Davis counters that, for nonpecuniary damages to be recoverable, the obligee's nonpecuniary interest need only be a

denied, 488 U.S. 926, 109 S. Ct. 310, 102 L. Ed. 2d 328 (1988). In Stephenson, an investor brought suit against a brokerage house and its individual broker for trading securities on his behalf without authorization. The district court "dismissed [investor's] claim for emotional distress on the grounds that Louisiana law requires a nonpecuniary interest as the cause for emotional distress, and no such interest was present in [that] case." Id. at 1101. On appeal, we deferred to the district court's determination of Louisiana law, noting that (1) "a district court is in a better position than we are to ascertain the law of the state in which it sits" (but Stephenson was decided before the Supreme Court, in Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S. Ct. 1217, 1221, 113 L. Ed. 2d 190 (1991) abolished such deference) and (2) the investor had not demonstrated that any trades were "unauthorized" as that term is legally identified. Id. The second case relied on by Parker, Abu-Kiskh v. Vintage Petroleum, Inc., 764 F. Supp. 76 (W.D. La. 1990), does not address stock transfer agreements. In that case, the parties entered the contract to (1) compensate plaintiff for the oil company's previous use of her property as a disposal site, and (2) lease the property for such use in the future. Id. at 77. When the company ceased paying minimum monthly rent, the plaintiff filed suit for breach of contract seeking, inter alia, damages for mental suffering. The district court rejected this claim, concluding that "[t]he contract in question has as its primary object the recovery of past compensation and future income — purely pecuniary objects."). Id. at 80.

significant object or cause of the contract, which is a question of fact.[80] The jury could reasonably have concluded, continues Davis, that the contract had as a significant object or cause some nonpecuniary interest —— the trusting bond of friendship and brotherhood shared by Parker and Davis, for example. Davis insists that Parker was his "attorney and best friend," someone whom he trusted to guide him through the tough times. Furthermore, Davis urges, the jury could have found that Parker acted with an overt intention to cause Davis emotional distress, the second ground for awarding such damages under Article 1988.

Davis insists that the record demonstrates beyond question that he indeed suffered emotional distress, pointing to his testimony that the experience has been very traumatic. He contends that his anguish included not only that which he experienced from learning of the betrayal of trust and from his humiliation at being "taken," but also the trauma of having to sell his home to satisfy creditors and the reduction in his assets.[81] Relying on Quealy v.

---

[80]Stonecipher v. Mitchell, 655 So. 2d 1381, 1385 (La. Ct. App. 1995)(emphasis added)("[W]e understand the current law to be that the obligee's nonpecuniary interest need only be a 'significant' object or cause of the contract in order for nonpecuniary damages to be recoverable.")(citing Young v. Ford Motor Co., Inc., 595 So. 2d 1123 (La. 1992)).

[81]Davis notes that he was "reduced to assets consisting of 4 lots in Picayune, Mississippi, two payments left from a note receivable, household furnishings, and about $8,000 in the bank."

<u>Paine Webber, Jackson & Curtis, Inc.</u>,[82] Davis argues that such evidence is more than sufficient to support the jury's award for mental anguish.

We agree with Parker on this point. The nature of the contract at issue was not to gratify any nonpecuniary interest of Davis's. Our review of the entire record reveals nothing of this nature. Moreover, our record review turns up little if any evidence (beyond Davis's one bare statement of the affair's being traumatic) of emotional distress. We conclude that no reasonable jury could find that Davis suffered an actionable type of emotional distress from Parker's breach of contract. Thus, the award of damages for emotional distress cannot stand.

G.   ATTORNEYS' FEES

The district court correctly instructed the jury that a party against whom rescission is granted on grounds of fraud is entitled to damages and attorneys' fees. The court explained that in determining the amount of attorneys' fees, the jury must consider those factors provided in Louisiana's Rules of Professional Conduct:

---

[82]475 So. 2d 756 (La. 1985)(upholding damages for mental anguish, humiliation and inconvenience in action against broker and issuer based on unauthorized sale of stock (conversion), when (1) dividends from converted stock constituted plaintiff's main source of income (except for a small disability pension); (2) plaintiff's living conditions were drastically impaired by the loss of those dividends; (3) plaintiff was physically unable to work; and (4) as of the date of trial, plaintiff had been without the dividend income for six years).

[One,] [t]he time and labor required, the novelty and difficulty of the questions involved[,] and the skill requisite to perform the legal service properly; [two,] [t]he likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; [three,] [t]he fee customarily charged in the locality for similar services; [four,] [t]he amount involved and the result[s] obtained; [five,] [t]he time limitations imposed by the client or by the circumstances; [six,] [t]he nature and length of the professional relationship with the client; [seven,] [t]he experience, reputation and ability of the lawyer or lawyers performing the service[s]; and [eight,] [w]hether the fee is fixed or contingent.[83]

The jury concluded by a preponderance of the evidence that Parker induced Davis to enter the written agreement through fraud. Having thus answered affirmatively regarding fraud in the inducement, the jury dutifully turned to a subsequent interrogatory, i.e., "[D]o you find that the plaintiff's attorneys are allowed to recover their attorney fees as provided in the contingency fee agreement?" The jury again responded in the affirmative. Had the answer been "no" — rejecting the contingent fee arrangement — the jury would have proceeded to consider next what amount of attorneys' fees the plaintiff's attorneys were entitled to recover; but that interrogatory was mooted by the jury's approbation of the contingent fee arrangement. The district court entered judgment against Parker in the sum of $3,200,278.60,

---

[83]Articles of Incorporation of the Louisiana State Bar Association, LA. REV. STAT. ANN., Title 37, ch. 4 app., art. 16 (West 1988) (Rules of Professional Conduct, Rule 1.5(a)) (articulating the factors considered in determining the reasonableness of an attorney's fee). Rule 1.5 is the embodiment of former Disciplinary Rule 2-106 of the Code of Professional Responsibility.

representing attorneys' fees under the contingent fee contract, plus legal interest from the date of the jury verdict.

When, in August 1996, it denied Parker's alternative motion for j.m.l. or new trial, the court rejected Parker's claim that there was insufficient evidence to support the one-third contingent fee award, noting that "the jury was presented with a copy of the attorney fee agreement and was instructed by [the] court regarding the appropriate factors to be considered in assessing the reasonableness of an award for attorney fees." The court reasoned that, "[a]lthough the plaintiff did not present any evidence regarding actual time expended upon the trial, the jury was certainly in a position to determine whether the contingency fee agreement that was presented was reasonable in light of the amount of documents presented, complexity of these issues, and any other factors which the jury could observe through trial." "Had the jury found that the contingency fee agreement was not reasonable," continued the court, "the plaintiff was willing to accept 'zero' attorney fees due to the fact that there was no other evidence of attorney time submitted."

In a diversity case, state law governs the award of attorneys' fees.[84] Under Louisiana Civil Code Article 1958, "[t]he party against whom rescission is granted because of fraud is liable for

---

[84]Texas Commerce Bank v. Capital Bancshares, Inc., 907 F.2d 1571, 1575 (5th Cir. 1990).

damages and attorney fees."[85]  "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other.  Fraud may also result from silence or inaction."[86]  "To find fraud from silence or suppression of the truth, there must exist a duty to speak or to disclose information."[87]  This duty can arise by statute or by a special relationship between the parties, such as a fiduciary relationship.[88]  Given the jury's verdict on the merits, an award of attorneys' fees to Davis is appropriate.

An attorney's fee must be reasonable; however, a court is not bound by the terms of a contingent fee agreement in determining the reasonableness of a fee award.[89]  "[C]ontingency fee contracts, like all other attorney fee contracts, are subject to review and control

_____

[85]LA. CIV. CODE ANN. art. 1958 (West 1987).

[86]LA. CIV. CODE ANN. art. 1953 (West 1987).

[87]Greene v. Gulf Coast Bank, 593 So. 2d 630, 632 (La. 1992).

[88]America's Favorite Chicken Co. v. Cajun Enters., Inc., 130 F.3d 180, 186 (5th Cir. 1997)(citing Greene, 593 So. 2d at 633).

[89]See, e.g., Adams v. Franchise Fin. Corp. of Am., 689 So. 2d 572, 577 (La. Ct. App.)(concluding that the award of the contingent fee was not excessive nor an abuse of discretion), writ denied, 692 So. 2d 456 (La. 1997); see also Southern Pac. Transp. Co. v. Chaubert, 973 F.2d 441, 449 (5th Cir. 1992)("That a fee is contingent may be considered, but the court is not bound by this consideration alone."), cert. denied, 507 U.S 987, 113 S. Ct. 1585, 123 L. Ed. 2d 152 (1993).

by the courts —— most notably for reasonableness."[90]  The quantum of an award of attorneys' fees is a question of fact and thus appropriately a jury issue.[91]

Parker argues that the record fails to show that Louisiana law was followed in the award of attorneys' fees.  He advances that attorneys' fees may not be recovered except when authorized by statute or contract,[92] and insists that no statutes authorize recovery in this case.  Specifically, Parker contends that attorneys' fees are not available under Article 1997 of the Civil Code, which governs damages awardable for a bad faith breach of contract.  Furthermore, he maintains that Article 1958, which makes attorneys' fees available when rescission is based on fraud, is not applicable in this case, as Davis's claim of fraud was legally insufficient and should not have been considered by the jury; he asserts that "fraud cannot be imputed from alleged misrepresentation(s) alone but, rather, must be based solely on a person's intent <u>not</u> to perform."[93]  Thus, concludes Parker, the award of attorneys' fees on the basis of fraud is inappropriate.

---

[90]<u>O'Rourke v. Cairns</u>, 683 So. 2d 697, 701 (La. 1996).

[91]<u>Francis v. Travelers Ins. Co.</u>, 581 So. 2d 1036, 1044-45 (La. Ct. App.), <u>writ denied</u>, 588 So. 2d 1114 (La.) <u>and</u> 588 So. 2d 1121 (La. 1991).

[92]<u>State, Dep't of Transp. and Dev. v. Williamson</u>, 597 So. 2d 439, 441 (La. 1992).

[93]<u>Automatic Coin Enters., Inc. v. Vend-Tronics, Inc.</u>, 433 So. 2d 766, 767-68 (La. Ct. App.), <u>writ denied</u>, 440 So. 2d 756 (La. 1983).

Parker argues in the alternative that, even if attorneys' fees were properly awarded, the amount of the instant award cannot be justified. He observes that (1) although the jury instructions recited the factors that determine the reasonableness of a fee, the interrogatory on the issue covered only one of these — whether the fee is fixed or contingent — when it asks whether Davis's attorneys were allowed to recover "attorney fees as provided in the contingency fee agreement"; and (2) there was no evidence on which the jury could determine the reasonableness of the fee awarded. Parker insists that Davis should have introduced contemporary time records or testimony of time spent.

Davis responds first that, in light of the court's charge to the jury that fraud can be committed by a failure to disclose that of which there is a duty to speak,[94] the finding of fraud is legally sufficient. Davis urges that Parker, as his attorney, had a duty to disclose all relevant and material information, including his true motivation for inducing Davis to enter the contract, his

---

[94]The court stated, in part, "[c]onsent to a contract can also be destroyed by fraud or misrepresentation. Fraud is a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." The court also explained that "[w]hen an attorney enters into a business transaction with a client, the attorney has a fiduciary obligation to either fully disclose the relevant information to the client . . . or advise the client to seek outside counsel before completing the transaction. Failure to do so may constitute a breach of fiduciary duty by an attorney if an attorney/client relationship exists, regardless of whether the attorney entered the particular transaction as a businessman."

conflict of interest, and his conviction that the stock was worth more than he was leading Davis to believe. Davis notes that Parker admitted that he failed to disclose the relevant details of the transaction.[95] This, combined with the fact that Parker secured the release of the Guaranty Bank debt within a few days following the stock transfer but did not even attempt to procure a release of the debt to the Campbells, maintains Davis, was sufficient to support the jury's conclusion that Parker "was planning something from the very date of the initial transfer."

Responding next to Parker's argument that the amount of the award cannot be justified, Davis insists that the district court's rejection of this position in Parker's post-trial motions was entirely proper. Davis correctly notes that proof of the value of an attorney's services is not necessary if the services are evident from the record,[96] and insists that — contrary to Parker's assertions — the record does indeed support the jury's award of

---

[95]Parker testified that he did not tell Davis that (1) he should consult another attorney before entering the transaction, and (2) he (Parker) was acting as a businessman — not as Davis's attorney — in the transaction. Parker complains that Davis's argument is inconsistent inasmuch as when Davis needs Parker to be an attorney (to establish a duty to disclose information so that fraud can be argued and attorney's fees awarded), he is "conveniently" an attorney; however, when Davis needs Parker to be a businessman (to avoid prescription or preemption), he is just a businessman.

[96]Hebert v. State Farm Ins. Co., 588 So. 2d 1150, 1153 (La. Ct. App. 1991)("[P]roof of the value of an attorney's services is not necessary if the services are evident from the record or were rendered under the supervision of the court.").

attorneys' fees. Davis bases his argument on the opinion of a Louisiana court of appeal in Adams v. Franchise Finance Corp. of America.[97] In Adams, the trial court awarded a one-third contingent fee. The court of appeal acknowledged that "[n]o independent evidence was presented by Adams on this issue, other than what the trial court could observe from the record and an affidavit by Adams showing that he had signed a contingency fee contract with his counsel . . . ,"[98] but affirmed the award of the contingent fee nonetheless. The Adams court took into account, inter alia, (1) "the considerable actions taken by Adams' counsel as well as other members of his firm that have been involved with this litigation since its inception in 1991"; (2) "[the attorney's] high degree of skill and ability as evidenced by the pleading, briefs, and oral arguments"; (3) "[the] considerable amount of money in dispute and [that] plaintiff made a full recovery in the trial court which was upheld by this court herein"; and (4) that "[c]ounsel for the plaintiff provided substantial legal services which consisted of numerous filings, considerable discovery, and the filing and opposing of the motion for summary judgment together with supporting memoranda and exhibits."[99]

Davis argues that the information before the jury in this

[97]689 So. 2d 572 (La. Ct. App.), writ denied, 692 So. 2d 456 (1997).

[98]Id. at 577.

[99]Id.

case, like that in Adams, is sufficient to support the contingent fee award. The jury was presented with the contingent fee agreement and asked to determine whether Davis's counsel were entitled to recover that amount. In further parallel with the situation in Adams, Davis's counsel did not present independent evidence on the issue: They presented no records of hours expended, hourly rates, priority of service, complexity of the litigation, special expertise, or the like. Nonetheless, Davis insists, the jury was aware of (1) his difficulty in securing an attorney; (2) how hard and bitterly Parker opposed Davis's claim; (3) how long it took to bring the case to trial; (4) the extensive effort expended, in light of the appeal from the summary judgment in Parker I on prescription and the remand for additional proceedings; (5) the massive expenditures on voluminous exhibits and the quantity of testimony; and (6) the time-consuming and lengthy nature of the trial.

Finally, Davis contends that Parker was content to risk all-or-nothing when the interrogatories were submitted to the jury. As such, he should not be heard to complain now that he finds himself on the losing end of that bet.[100]

In the context of attorneys' fees, Parker's argument regarding the absence of fraud is nothing more than sophistry. Given the

_____

[100]As to his alleged contentment with the interrogatory, Parker notes that he objected to the interrogatory, and the objection was overruled.

substantive instructions to the jury, its finding of fraud in the inducement, and our statements in Parker I, Parker cannot avoid Davis's entitlement to attorneys' fees by denying the presence of fraud.[101]  There was sufficient evidence for the jury to have concluded that Parker committed fraud, both passively, in failing to disclose the relevant information and not advising Davis to seek independent legal counsel, and actively, in misleading Davis by orally committing to retransfer the stock while having no intention of doing so.  As for the reasonableness of the fee awarded, when we consider that, as Parker states, (1) we must follow Louisiana law in this diversity case, and (2) under Louisiana law this was appropriately a question for the jury, we conclude that no reversible error was committed by the district court in rendering judgment on the basis of the jury's award of attorneys' fees. Inasmuch as we have reversed the award of $175,000 for emotional distress, the award of attorneys' fees must be reduced by an amount equal to one-third of the disallowed recovery, i.e., by $58,333.

H.   COSTS

The same cannot be said of the court's assessment of costs, specifically the quantum of expert witness fees.  The state of the record and the court's disposition of the matter are such that we

---

[101]Parker I, 58 F.3d at 190 (noting that attorney's failure fully to disclose relevant information regarding business transaction with client or to advise client to seek outside counsel before completing transaction may constitute breach of fiduciary duty if attorney/client relationship exists, regardless of whether attorney entered the transaction as businessman).

simply have no basis for an appropriate appellate review. Regrettably, the record is confused, contradictory, and incomplete on this issue.

Parker insists that federal law governs, adding that the trial judge appears to have had no intention of awarding expert witness fees as costs.[102] In stark contrast, Davis responds that (1) there is no order in the record taxing costs, and (2) as Parker failed to oppose the Bill of Costs submitted by Davis, as required by the Uniform Local Rules of the United States District Courts for the Eastern, Middle, and Western Districts of Louisiana, he may not raise the issue for the first time on appeal. Parker counters that (1) if the expert witness fees were never taxed, they are not collectible, and (2) as he was never served with a copy of the Bill of Costs, he could not be expected to have objected to them.

Try as we may, we cannot sort out, from the record on appeal, just what was or was not ruled on by the court or what was or was not preserved for appeal by the parties. As there is thus no way for us to make an informed and intelligent decision on the issue of expert witness fees and other costs at the trial level, we must remand this issue for further consideration and determination by the district court.

I.   STOCK VALUATION

---

[102]After discussing our opinion in Cates v. Sears, Roebuck & Co., 928 F.2d 679 (5th Cir. 1991), the district court stated, "I'm just going to continue to deny the fee bills for the expert witnesses now until you come up with something different."

61

In keeping with the jury's verdict, the district court declared Davis to be the owner of 201,775 of the shares of common stock of Sanifill that Parker acquired in the merger between Sanifill and Campbell Wells in June 1990, or its value as of the close of business on April 19, 1996 —— the last business day before trial commenced —— with interest from the date of judgment. The court ordered Parker to return those shares or their aggregate dollar equivalent to Davis. Finally, the court entered judgment against Parker in the amount of $1,201,951.50, plus legal interest from the date of demand until paid, which included the amount of damages —— $1,026,951.50 —— that the jury found "necessary to compensate Davis for the loss of any benefits that he would have received had he owned the Campbell Wells stock, or for benefits that Parker wrongfully received as a result of his refusal to return Davis's stock."

Parker contends that the award of the value of the Sanifill stock as of April 19, 1996 cannot be supported under Louisiana law. Davis originally demanded the return of the Campbell Wells stock transferred on February 3, 1986, but Parker insists that he no longer owns either that stock or the Sanifill stock received in the merger. When Campbell Wells merged with Sanifill in June 1990, Parker surrendered all the Campbell Wells stock in his name in exchange for Sanifill stock. Parker maintains that this prevents restoration in-kind from being an available remedy; that Davis's remedy must be in money damages only. Parker urges, however, that

62

measuring those damages by the value of Sanifill stock almost six years after the merger is neither fair nor lawful.

To the contrary, maintains Parker, Davis may recover only a limited damage award. Parker asserts that if Davis is entitled to annul the agreement, he is entitled to be restored to his pre-contract status only; but if the contract is valid and was breached, Davis is entitled to the value of the Campbell Wells stock as of the date the breach occurred, not at some later, higher value. Parker complains that awarding Davis the value of the stock of a multinational corporation as it stood in 1996 gives Davis a windfall, as the shares that he now claims to own were exchanged for that stock in 1990, with no evidence that he would have retained the stock throughout that six-year period had he owned it.

Davis responds that he is entitled to receive the value of the Sanifill stock as of April 19, 1996, and that he can be awarded the stock in-kind, disagreeing with Parker's contention that damages are the only remedy.[103] Davis correctly points out that the traditional measure of damages for conversion — the return of the property itself or, if the property cannot be returned, the value

_____

[103]See Parker I, 58 F.3d at 190 ("Neither party has demonstrated that Davis could not be awarded restoration in kind even though the Campbell Wells stock no longer exists. At least one Louisiana court has suggested in a similar factual setting (involving a fiduciary relationship between business partners) that restoration in kind is possible where the shares of the original partnership had been exchanged for shares in a different partnership.") (citing W.A. McMichael Constr. Co. v. D & W Properties, Inc., 356 So. 2d 1115, 124-25 (La. Ct. App.), writ denied, 359 So. 2d 198 (La. 1978)).

of the property as of the time of conversion — will not always afford an adequate remedy in cases involving equity securities.[104] Davis relies on the Louisiana Supreme Court's decision in Quealy, in which the plaintiff was awarded the market value of his lost stock as of the day before trial, not the value of the shares on the date they were wrongfully converted. In so holding, that court stated:

> In the case of stock, which fluctuates in value, applying the general rule of damages will not always accomplish the goal of making the victim whole. Such is the case here. In order for Paine Webber to fully repair the damage caused, it must reimburse Quealy in an amount sufficient to enable him to repurchase exactly what was lost: 1,500 shares of NEGEA stock. La.Civ.Code arts. 2315 and 1995. The trial judge thus properly awarded Quealy an amount commensurate with the value of 1,500 shares of NEGEA stock as of the day before trial.[105]

We conclude that the district court did not err in awarding Davis recovery of either the Sanifill stock in-kind or its value as of the last business day before trial commenced. Parker exercised total dominion over Davis's property either through fraud or as a bad faith mandatary or depositary (or possibly even a negotiorum gestor). The proper measure of damages is the value of the converted stock when Davis obtains a final, executory judgment and is free to proceed with execution. Here, the shares of stock actually converted no longer exist, having been exchanged for other

---

[104]Trahan v. First Nat'l Bank of Ruston, 690 F.2d 466, 467-68 (5th Cir. 1982); Quealy, 475 So. 2d at 761-62.

[105]Quealy, 475 So. 2d at 762.

stock in a subsequent merger.  Accordingly, Davis cannot obtain the return of his original Campbell Wells shares.  Further, it now appears that the stock of the acquiring company, Sanifill, is no longer in the hands of Parker and, indeed, has been exchanged in a second merger.  Nevertheless, Davis is entitled to judgment for the value of the Campbell Wells shares as converted into Sanifill shares (or shares resulting from their subsequent merger) if they are still in the hands of Parker.[106]  In essence, even though the original Campbell Wells stock no longer exists because of the Sanifill merger, its conversion equivalent in Sanifill stock was held and later disposed of by Parker, and Davis is entitled to the equivalent number of shares or their value.  Because Parker wrongfully kept the stock, depriving its true owner of the discretion to retain or dispose of it, in whole or in part, at such times as he (not Parker) might select, it is Parker (not Davis) who must bear the risks of its management.  Additionally, as Parker unilaterally elected to manage the property of Davis in bad faith he cannot retain any profit that was made.  The district court correctly determined that Parker owes Davis the value of the

---

[106]Although neither party bothered to inform the court, we have determined that Sanifill was acquired by USA Waste Services, Inc. ("USA Waste") in September 1996.  We note that Sanifill's merger partner is publicly traded and the information on the share ratio is public knowledge.  Consequently, conversion of Sanifill shares to USA Waste shares can be calculated by means of simple arithmetic.  If Parker is to satisfy the judgment with stock, in-kind, he must obtain the requisite number of shares — albeit USA Waste shares, as a result of the 1996 merger — and deliver them to Davis.

property at the time that the judgment is satisfied, but in no case less than its value at the time of Parker's illicit acquisition.[107]

J.   EXCESS DISTRIBUTIONS

Parker contends that there is no basis in law or fact for the jury's conclusion that the parties intended for any "excess distributions" to belong to Davis, and submits that the award is inconsistent with Davis's testimony regarding his purpose for entering the transaction —— to pay off creditors.  Moreover, Parker urges, even if the distributions alleged by Davis —— dividends, salary, travel, and entertainment —— were made,  Davis is not the proper party to assert such claims.  Instead, insists Parker, such claims belong to the corporation —— not its shareholders —— and especially not to a putative shareholder such as Davis.

Davis counters that the award for excess distributions was entirely proper, as it represents payments received by Parker after he no longer had any lawful right to hold Davis's shares.  This entitlement to the payments derived from ownership of the stock does not stem from any contractual arrangement between the parties,

---

[107]If Parker still had the Campbell Wells stock, Davis could receive its return in kind.  Were it worth less now than when converted, Davis would be entitled to its return plus money for its diminution in value.  The victim of fraud must never recover less than the value of the stock on the date of conversion.  See Atkins v. Garrett, 270 F. 939 (5th Cir. 1921)(in action for conversion of stock by a seller, brought after his refusal to make delivery on tender of the agreed price, the measure of recovery is the value of the stock at the time of conversion, and defendant cannot then avoid liability by a tender of the stock, which had declined in value).

continues Davis; neither is it contrary to his testimony regarding how cash flow was supposed to be used during the time Parker held the shares with Davis's consent. Moreover, insists Davis, he is the proper party to assert the claim for excess distributions, as Louisiana courts consistently recognize that shareholders possess a right of action to recover for injury suffered by them —— "personal losses" —— as a consequence of a defendant's interference with their ownership of corporate stock.[108]

We perceive no reversible error by the district court in rendering judgment based on the jury's award of these damages. The jury found that Davis never stopped being the beneficial owner of the Campbell Wells stock. Consequently, Parker is not entitled to retain these sums; rather, such monies should be returned to Davis, the beneficial owner of the stock, ab initio. We also reject Parker's argument that Davis is not the proper party to bring such

---

[108]See Wilson v. H.J. Wilson Co., Inc., 430 So. 2d 1227, 1234 (La. Ct. App.), writ denied, 437 So. 2d 1166 (1983). In holding that a minority shareholder could maintain a breach of fiduciary action against a corporation's majority shareholder based on its allegedly fraudulent transfer of the minority shareholder's shares to the majority shareholder, the court declared:

> It is established that where the breach of fiduciary duty causes loss to a corporation itself, the suit must be brought as a derivative or secondary action. However, that is not the case where the breach of a fiduciary duty causes loss to a shareholder personally. In case of personal loss, the shareholder may sue individually to recover his loss.

Id. (citing Junker v. Crory, 650 F.2d 1349 (5th Cir. 1981)); Noe v. Roussel, 310 So. 2d 806 (La. 1975); 29 LA. L. REV. 691 (1969)).

a claim, as this is plainly an action for personal loss, and not one for the devaluation of corporate shares.[109] The claim asserted by Davis is not that the disbursements were improper or excessive, only that they rightfully belong to him and not Parker, whether as preferential dividends or perquisites of ownership. Finally, we note that, as Parker's argument rests solely on the propriety of the award and never questions its quantum, we need not address whether the amount is excessive, inadequate, or "just right." We treat Parker's failure to address the quantum of the award, or even provide record citations to discussions of quantum, as a waiver of this facet of the issue. Neither do we consider what portion of these "excess distributions," if any, Parker might have been entitled to receive as an owner of Campbell Wells stock in his own

---

[109]Whalen v. Carter, 954 F.2d 1087, 1092 (5th Cir. 1992). ("Under Louisiana law, damage claims predicated upon the depletion of corporate assets belong to the entity, not to individual investors. . . . Minority shareholders, therefore, do not have a right of action against the officers and directors of their corporation for the devaluation of corporate shares."). In Palowsky v. Premier Bancorp, Inc., 597 So. 2d 543 (La. Ct. App. 1992), the Louisiana First Circuit Court of Appeal construed the holding in Wilson to mean that

> if a shareholder suffers only an indirect loss in the form of a decline in the value of his stock resulting from a loss sustained by the corporation due to mismanagement and/or breaches of fiduciary duty, that shareholder may only bring a derivative action on behalf of the corporation. However, if the breach of fiduciary duty causes a direct loss to the shareholder, as was the case in Wilson where the shareholder, but not the corporation, suffered a loss, that shareholder may have a right to sue individually.

Id. at 545 (distinguishing Wilson, 430 So. 2d 1227).

right, as this argument has not been raised on appeal.

K.   CROSS-APPEAL

Davis filed a motion to alter or amend judgment, pursuant to F.R.C.P. Rule 59(e), requesting that the district court modify its judgment to declare him to be the owner of, and order Parker to return, 201,775 shares of common stock of Sanifill or, at Davis's option, their dollar value calculated at the rate of $41 5/8 per share ($8,398,884), with interest from the date of judgment. Davis's motion requested, in the alternative, that the district court amend its judgment to declare that he was the owner of, and Parker was required to return, the same number of shares of common stock of Sanifill or, in the event that the value of the shares on the date of their return is less than $41 5/8 per share, their total dollar value calculated at that amount.   Finally, Davis requested that the district court add to its decree a provision reserving to him the right to claim damages resulting from any decline in value of the Sanifill stock from the highest price the stock might attain between the dates of the entry of judgment and the stock's return.

The district court denied Davis's motion.   In its June 21, 1996 minute entry, the court "ordered the parties to prepare an order to transfer two hundred one thousand, seven hundred seventy-five (201,775) shares of common stock of Sanifill, Inc. to the United States Marshal to hold as receiver, or, in the alternative, the cash value of such stock as of Friday, April 19, 1996, to the

69

Clerk of Court." The court further ordered that "[t]he stock shall be transferred to the Marshal or the cash shall be placed with the Clerk no later than Friday, June 28, 1996." Then, in its memorandum ruling and order of June 26, 1996, filed on June 27th, the district court stayed its judgment pending disposition of Parker's post-trial motions, but conditioned the stay on Parker's delivery of the shares to the United States Marshal or his deposit of $8,398,884.30 in cash with the Clerk of Court by June 28, 1996.

Davis contends that the district court abused its discretion by not either (1) giving Davis, rather than Parker, the option to choose between being paid or recovering the stock in-kind, or (2) allowing Parker to pay the value of the stock in lieu of returning it in-kind only in the event that the stock's value on the day before trial shall have been greater than on the date of return. Davis essentially argues that Parker must not be able to use this appeal to speculate in the stock and profit from a delay in his satisfaction of the judgment; rather, Davis advances, "the risk must borne by the one who has wrongfully held the stock," i.e., Parker. Davis further urges that any increase in the market value of the stock belongs to him, but any decline in market value during the time the stock was unlawfully held by Parker must be absorbed by Parker. Finally, Davis asserts that the judgment should have been amended to reserve his right to bring a separate action for any damages that he might suffer as a result of Parker's delay in satisfaction of the judgment, again insisting that Parker

70

must bear any risk of loss attendant on such a delay.

Parker responds that Davis's argument is flawed in two respects: First, as Parker no longer owns the stock, he is not in a position to speculate with it by returning it only if it is in his financial interest to do so; and second, if the stock cannot be returned, Davis's remedy is damages which, Parker maintains, were fixed by the court at the most favorable point Davis could have imagined. Any effort to receive the value of the stock beyond that remedy, insists Parker, would be an action for damages, not for stock return, thereby making this case exactly what Davis contended it was not on the first appeal to escape the legal malpractice prescription.[110]

We conclude that the district court did not abuse its discretion in giving Parker the option of delivering the stock or its value. We agree with Davis, however, that Parker should not be able to profit from any appreciation in the value of the stock during the pendency of this appeal. Accordingly, if Parker has failed timely to (1) file a supersedeas bond, (2) pay the money to the Clerk of Court, or (3) transfer the stock to the United States

---

[110]Davis responds that, in an action for rescission based on nullity, "[t]he restoration of the parties to the situation that existed before the contract that is called for by this Article [Article 2033] includes restoration of the fruits and revenues, as any unjust enrichment of the parties must be prevented." LA. CIV. CODE. ANN. art. 2033, cmt. b (West 1987). As such, Davis insists that his demand that Parker not be permitted to profit by speculation from this appeal is part and parcel of his rescission remedy.

Marshal, as ordered, such that the judgment remains unsatisfied, then reason, equity, and justice require a supplemental provision to the district court's judgment. For, if Parker thus elected to take an appeal but to do nothing about paying the judgment into the registry of the court, delivering the stock to the Marshal, or posting a supersedeas bond, he must bear any risk of downward fluctuation, and Davis must recover the benefit of any upward fluctuation, in the value of the stock. Therefore, if, in lieu of delivering the stock, Parker elects to pay the value of the stock, then any appreciation in its value from June 28, 1996 must be added to the amount of the judgment, $8,398,884.30; but if the value of the stock has never been that high since June 28, 1996, Parker may not thereby benefit by electing to deliver the shares of stock — unless he supplements such delivery with remittance of funds (or additional shares of stock) so as to bring the value of the delivery up to full judgment value as of the time of delivery. Parker should, of course, receive credit for any funds that Davis may have acquired or may hereafter acquire in executing on the judgment.[111]

---

[111]As noted in note 106 supra, Sanifill was acquired by USA Waste in September 1996. This fact, however, does not alter our disposition as to this issue. Assuming that Parker has neither deposited the money nor an equivalent number of shares in Sanifill, or its successor USA Waste, the judgment must be amended, but only to the extent required to allow for fluctuations in the stock price during the time between the date originally specified for delivery (June 28, 1996) and the date on which Davis finally recovers the money, if that is what he recovers in lieu of the equivalent shares of stock in the appropriate successor entity. In this regard, we

III

CONCLUSION

For the foregoing reasons, the judgment of the district court in favor of Davis is affirmed, subject to the following:

A. The award to Davis of nonpecuniary damages for emotional distress is reversed, and the award to Davis of attorneys' fees is reduced by $58,333 to reflect the effect of disallowing such nonpecuniary damages.

B. To the extent, if any, that the award of costs to Davis may include expert witness fees, such award is vacated and the issue of such fees is remanded to the district court for further proceedings consistent with this opinion.

C. The award to Davis of 201,775 shares of the common stock of Sanifill, Inc., in-kind, is modified to permit the substitution of shares of the common stock of USA Waste Services, Inc., with the number of such shares to be the same as were received for 201,775 shares of Sanifill, Inc. stock in the merger of those corporations in September 1996, adjusted to

reiterate that Davis will be entitled to recover the highest value of the stock between the day delivery was ordered and the date of actual recovery.

73

account for any subsequent stock splits, stock dividends, and the like.

D. The alternative monetary award to Davis in the amount of $8,398,884.30, being the value of 201,775 shares of Sanifill, Inc. common stock on the day before the commencement date of the trial of this case, is modified by adding the proviso that, in the event that Parker should satisfy the judgment of the district court by paying money in lieu of delivery of capital stock in-kind, the sum of money that he must pay shall be the greater of (1) $8,398,884, or (2) an amount calculated by multiplying 201,775 by the highest price for a share of Sanifill, Inc. common stock (or, after its merger with USA Waste Services, Inc., the number of shares or fractional shares of that corporation obtained for one (1) share of Sanifill, Inc. common stock in that merger, adjusted for stock splits, stock dividends, and the like) as quoted by any exchange on which such stock was or is traded, between June 28, 1996, and the date on which final payment in full is made in satisfaction of the judgment in this case.

74

We remand this case to the district court to revisit the issue of expert witness fees and to enter a revised judgment reflecting the foregoing modifications.

REVERSED in part; VACATED and REMANDED in part; MODIFIED in part; and, as modified, AFFIRMED in part.